2010 VT 100

### John BOMBARD, Jr. v. DEPARTMENT OF LABOR (Fisher Auto Parts, Inc., Employer)

[12 A.3d 533]

No. 09-380

¶ 1. November 8, 2010. Claimant appeals the denial of his request for unemployment benefits. On appeal, claimant argues that the hostile work environment at his job provided good cause to quit, and that the Board's conclusion otherwise is not supported by the findings. We disagree, and affirm.

¶ 2. The facts found by the Board can be summarized as follows. Claimant worked for employer Fisher Auto Parts, Inc. for nineteen months until he quit on May 4, 2009. His work tenure began at employer's Burlington store, where his manager had a volatile temper, at times throwing items around the store. During one angry episode, the manager used profane and threatening language towards claimant. Claimant reported this behavior to the regional manager, who

responded by transferring claimant to employer's store in Essex. Unfortunately, the manager at the Essex store also had anger problems, a fact employer knew prior to transferring claimant. Claimant had been there only a couple of weeks, when on April 23, 2009, the Essex store manager engaged in a day-long argument with his wife over the phone, during which he shouted, threw things on the floor and around the store, and drove off multiple times, only to return still arguing with his wife. Unable to discuss this behavior with the store manager directly because the manager was so angry and unapproachable, claimant called the regional manager and left a voice mail message indicating they needed to talk. No one called back. The regional manager does not remember receiving this message.

¶ 3. On April 30, the store manager again became angry and upset. He told claimant that he was fed up and wanted to get a gun, climb a tower, and shoot a hundred people. Claimant was so disturbed by this statement that the following day, on his way to work, he decided he was too frightened to return because of what the manager might do. Claimant called in and claimed he could not work because his father had a heart attack. The next work day, Monday May 4, claimant went to work and arrived to find the regional manager present at the store. Claimant met with the regional manager and described the Essex store manager's angry behavior, characterizing the store manager as unstable. Claimant did not, however, mention his local manager's threat to shoot a hundred people. The regional manager responded that things are "going to get worse" and that claimant had to make a decision. Feeling like nothing would be done to correct his supervisor's behavior, claimant quit a few minutes later.

¶ 4. Claimant filed for unemployment compensation benefits. This request was denied, and claimant appealed. At a hearing before a referee, claimant described the problems with his managers in employer's Burlington and Essex stores. The referee listened to claimant's testimony, but refused to admit additional evidence regarding the behavior of the manager in the Burlington store since claimant was no longer in that store or working for that manager when he quit. Claimant's regional manager testified. He verified there were complaints about the tempers of both the Burlington manager and the Essex manager, and testified that he handled claimant's concerns about the Burlington manager's anger problems by speaking with the manager. The regional manager also testified that he knew the store manager in Essex had a volatile temper before he transferred claimant to that store. Employer's response to that problem was also to speak to the store manager.

¶ 5. While accepting claimant's version of the facts, the referee denied the claim, finding that claimant did not give his employer an opportunity to correct the problem before quitting. The referee concluded that claimant "neither demonstrated that any reasonable person would have been compelled to quit without notice under the circumstances, or that the employer would have been [un]responsive to his concerns." Claimant appealed to the Board. The Board agreed with claimant that his supervisor had engaged in inappropriate behavior, but concluded that claimant failed to establish that the misbehavior was so egregious as to justify quitting without notice to employer or to establish, in the alternative, that complainant afforded his employer the opportunity to address the working conditions before quitting. Claimant appeals.

¶ 6. On appeal, claimant does not challenge the Board's findings, but argues that its findings do not support the Board's conclusion. Our task in reviewing the Department's decision requires, therefore, a determination of whether,

under the facts found, claimant voluntarily left without good cause attributable to the employer. See 21 V.S.A. § 1344(a)(2)(A) (voluntary termination is grounds for denying unemployment benefits absent good cause attributable to employer). This standard entails two considerations: first, whether there was "a sufficient reason to justify the quit," and second, whether the reason was "attributable to the employing unit." *Allen v. Dep't of Emp't & Training*, 159 Vt. 286, 289, 618 A.2d 1317, 1319 (1992) (quotation omitted). The burden is on the employee to prove both aspects of this analysis. *Lynch v. Dep't of Emp't & Training*, 2005 VT 114, ¶ 4, 179 Vt. 542, 890 A.2d 93 (mem.); *Skudlarek v. Dep't of Emp't & Training*, 160 Vt. 277, 280, 627 A.2d 340, 342 (1993). "Unless it can be demonstrated that the Board was erroneous in its findings and conclusions, we must uphold its decision." *Rushlow v. Dep't of Emp't & Training*, 144 Vt. 328, 330, 476 A.2d 139, 141 (1984) (citations omitted).

¶ 7. Because claimant initiated the separation from employment, it is his burden to demonstrate that his decision to quit was for good cause. *Lynch*, 2005 VT 114, ¶ 4. Generally, to determine good cause, we consider "what a reasonable person would have done in the same circumstances." *Isabelle v. Dep't of Emp't & Training*, 150 Vt. 458, 460, 554 A.2d 660, 661 (1988). There is no bright-line threshold in our law defining an intolerable working environment such that good cause to quit exists as a matter of law. Rather, we analyze each situation individually.

¶ 8. Our first point of analysis is whether claimant had sufficient reason to justify quitting his job. Examining the events at the Essex store, the Board found that claimant lacked sufficient reason to quit. For one thing, the Department found that the two incidents at the Essex store were not directed at claimant. Further, the Department found that

the Essex manager's outburst about shooting a hundred people was more likely a matter of "blowing off steam" than an actual and imminent threat. The Department ultimately decided that claimant did not meet his burden to prove good cause because he had not "demonstrated that any reasonable person would have been compelled to quit without notice under the circumstances." This conclusion is supported by claimant's return to the job within two days of the declared threat.

¶ 9. Even assuming the local manager's generalized threats of violence could have been sufficient grounds to quit, the same cannot be attributed to employer, which was uninformed about such misconduct. "Generally, notice to the employer is required when an employee leaves a job for unsatisfactory working conditions so that the employer has an opportunity to rectify the situation before becoming responsible for unemployment compensation payments." *Allen*, 159 Vt. at 290, 618 A.2d at 1319. The referee and the Board found that claimant did not inform his employer about the manager's threat at the Essex store. This is not disputed. Additionally, while he told the regional manager his general concerns about the store manager's anger in their May 4 meeting, claimant never reported the mass shooting threat or that he felt personally at risk in any way. Indeed, claimant did not provide notice of any specific problems, personal or general, until his meeting with the regional manager on May 4, after which he "quit within minutes."

¶ 10. Claimant argues unpersuasively that the Department should also have considered the events at the Burlington store on this point, on the theory that employer had the opportunity to rectify his situation starting then.[1] Even were we

_____

[1] The Department limited the scope of its inquiry to the last store to which claimant was assigned. On appeal, claimant asserts

to adopt this broader scope of inquiry — which, again, we decline to do — claimant's theory would fail for two reasons: his grievance at the second store was independent and distinct from the problem at the first store, and his grievance at the first store was resolved by employer's action. He argues that employer's decision to transfer him from the Burlington store was effectively a decision not to remedy that situation. Since employer failed to address the Burlington events, claimant argues, he had no reason to believe that it would have addressed the Essex events. Therefore, on claimant's logic, his quit was justified, and employer was responsible. The Board's finding that employee was satisfied with the transfer is unchallenged, however, and the differences in the managers' respective outbursts are undisputed. The Board's treatment of the Burlington incident as resolved and separate from the Essex situation is thus supported by the record and was not irrational. Moreover, even if claimant actually perceived the resolution of his first complaint as unsatisfactory, our precedent is that anticipation of a

the Board erred in refusing to permit testimony about employer's lack of response to the manager's angry outbursts in the Burlington store. This testimony was proffered in an effort to expand the scope of the inquiry into employer's response to claimant. Claimant's theory was that the behavior of the managers at both stores was related because it stemmed from their being overworked and from the failure of employer to address the managers' behavior in an effective way. However, the Board did not accept claimant's theory, finding that claimant's problems with the Burlington store were resolved to his satisfaction when he was transferred. Claimant has not challenged these findings by the Board, and it was within the Board's discretion to exclude the evidence.

poor outcome is not a substitute for providing the employer with notice of the basis for the employee's concerns. *Rushlow*, 144 Vt. at 331, 476 A.2d at 141 ("a quit for anticipatory reasons is not good cause attributable to the employer" (citing *Kasnowski v. Dep't of Emp't Sec.*, 137 Vt. 380, 382, 406 A.2d 388, 389 (1979)). Before terminating employment unilaterally, an employee must make some effort to remedy alleged poor working conditions or demonstrate that such effort would be unavailing. See *id.* (citing *Dunston v. Dep't of Emp't Sec.*, 136 Vt. 483, 484, 394 A.2d 1129, 1130 (1978)).

¶ 11. Claimant did not meet his burden of showing that a remedy would not be forthcoming. The regional manager's assertion that things would only get worse does not stand alone as a refusal to address the situation, especially in the full context of claimant's testimony. The situation, as described by claimant, was not that the local store manager was threatening him, but that company policies resulting in inadequate staffing imposed pressure on the local store manager that was making the manager irrational. Taking claimant's testimony as presented, the most the referee and Board could draw from it was that claimant confronted the regional manager not with a personnel problem peculiar to claimant, but with the larger problem of company staffing policy and its impact on management. That the company representative responded that things would get worse could reflect a lack of employer action to correct a problem reported by claimant between the company and its managers, but not inaction on any employment complaint personal to claimant. Likewise, the personal attacks against claimant by one supervisor at the Burlington store are irrelevant to the later, impersonal and generalized misanthropy experienced by claimant from a different supervisor at the Essex store.

¶ 12. Complainant likens his case to other cases in which harassment or abuse

on the job constituted intolerable working conditions amounting to "good cause" to quit. *Allen*, 159 Vt. at 289, 618 A.2d at 1319; *Turco v. Dep't of Emp't Sec.*, 141 Vt. 135, 446 A.2d 345 (1982). *Allen* was a sexual harassment case in which we carved out a limited exception to the notice requirement. We held that where female victims of confirmed unwanted and serial sexual overtures in the workplace were deemed particularly susceptible to reprisal for, and discouragement from, complaining about sexual harassment, "a claimant who fails to report sexual harassment before quitting her job . . . is not automatically precluded from receiving benefits." *Allen*, 159 Vt. at 292, 618 A.2d at 1320. Nothing in the facts of this case implicates the *Allen* exception.

¶ 13. *Turco* is distinguishable from the circumstances here on several grounds. In that case, the claimant's fellow employees repeatedly harassed him, accusing him, for example, of theft on the job, in large part because of his religious beliefs. Instead of addressing the claimant's concerns after receiving notice or aiding the claimant's efforts to resolve the situation, the employer there fueled the internal conflict by joining in the harassment or by inducing it through work assignments. After one incident, the claimant requested a meeting with his belligerent co-workers to address the problem. The employer refused. When, two days later, the employer assigned the claimant to work with one of the harassers and a physical altercation ensued, the claimant went to the vice president, complained of harassment, and announced that he intended to quit. The employer made no effort to address the problem, responding to claimant's departure simply by asking him to return his uniforms. We concluded the conditions in that case were intolerable because the employees directly harassed the claimant, yet, though claimant made the employer aware of his concerns, employer failed to take appropriate action. 141 Vt. at 138, 446 A.2d at 347.

¶ 14. In contrast, here the Board found the harassment experienced by claimant was not directed at him specifically. Nor did claimant make it clear to employer until the day he quit that the situation was even potentially intolerable, thus denying employer the opportunity to address any particularized employment complaint by the situation. In any event, assuming arguendo that the Board could have found sufficient cause to quit based on the given facts, its determination to the contrary is entitled to deference as supported by some evidence, such as claimant's return to work despite what the Board determined to be the supervisor's generalized and overblown threat.[2] See *Lynch*, 2005 VT 114, ¶ 6 (holding that when findings are supported by evidence, Supreme Court defers to Board's decision). Compared to *Turco*, claimant's circumstances here were markedly less severe, and employer's fault and unresponsiveness in the matter not established.

¶ 15. Claimant has failed to show any reversible error on the part of the Department. We therefore will disturb neither its factual finding and conclusion that claimant lacked good cause attributable to employer, nor its conclusion that claimant is not entitled to unemployment compensation.

*Affirmed.*

¶ 16. **Johnson, J.,** dissenting. The majority's overly technical and narrow view of an employee's obligation to inform his employer of problems in the workplace

---

[2] The dissent incorrectly attributes to this Court the characterization of the manager's shooting threat as "blowing off steam." *Post*, ¶ 19. Rather, this was the Board's conclusion as to the manager's "more likely" meaning, based on the generalized nature of the threat and the absence of any conduct to follow through. As noted above, this was further borne out by claimant's own return to the worksite one day later.

results in an unfair denial of benefits to claimant. The undisputed facts demonstrate that claimant suffered through intolerable working conditions at two of employer's stores and notified employer of these conditions on several occasions. By pretending that employer solved the first abusive situation and thus ignoring that history, the majority unreasonably concludes that claimant was required to make further efforts to resolve the problem at the Essex location. Given that the workplace conditions were intolerable and that any further attempt to resolve this situation would have been futile, claimant had good cause to quit, and I respectfully dissent.

¶ 17. The majority's decision in this case turns on the facts as found by the hearing officer, which include the following. In employer's Burlington store, claimant was subjected to profane and threatening comments by the manager. Employer's answer to claimant's complaints about this behavior was not to discipline the manager, but to relocate claimant to another store in Essex. Once relocated, claimant suffered through a day-long tirade by his new manager, during which the manager threw items around the store. Claimant did not leave his employment immediately following this episode, but attempted to report the behavior to management by calling and leaving a message with his regional manager. A week later, when the Essex store manager made a threat about killing 100 people, claimant was scared given the angry outburst he had already witnessed. Claimant created an excuse to avoid going to work the following day because he feared the manager. On Monday morning, the next work day, claimant arrived at work and spoke with the regional manager. Claimant raised his concern about the Essex manager's temper and instability. Claimant did not, however, repeat the Essex manager's threat to kill. At the end of this conversation, claimant quit his employment.

¶ 18. In addition to these findings, the record reveals the following pertinent facts that the hearing officer did not address. Employer's only witness, the regional manager, testified that prior to transferring claimant, he knew the Essex manager also had a bad temper and that other employees had previously complained about the manager being volatile and screaming on the telephone. The regional manager explained that he did not take any disciplinary action against either the Burlington or Essex managers, except to speak with them. He further testified that company policy allows referral of employees for anger management, but he did not do so for either manager in this case. Claimant testified that after he reported the Essex manager's inappropriate and angry behavior, the regional manager told claimant that things would only get worse and claimant should make a decision. Employer did not offer any conflicting testimony, and the findings do not address the issue. Moreover, the findings do not definitively establish the length or content of this conversation on the morning that claimant left his employment. The hearing officer's failure to fully resolve the factual discrepancies is troubling because it constrains our review.[3] I

_____

[3] The procedural history of this claim for unemployment compensation followed a routine pattern. Claimant appealed his initial denial of benefits to an administrative law judge. The hearing before this judge was informal and over the telephone. Although claimant was represented in his case, most of these hearings are done without counsel. The hearing officer made findings based on the evidence, and ruled against claimant. Claimant then appealed to the Board. The Board reviewed the hearing officer's findings and adopted them as its own. The Board did not make further findings. Based on the factual record, the Board affirmed the hearing officer. This proce-

recognize that hearings before an administrative law judge are intended to be summary and short, but there must be sufficient findings to support the decision. When a claimant may be denied benefits for failing to make a very specific statement at a very specific time, it is critical for hearing officers to fully resolve factual disputes in their decisions. In addition, when a case reaches the Board without a proper resolution of key factual issues, the Board should remand the case to the hearing officer rather than proceeding with an incomplete record. Given these shortcomings, at the very least, this case should be remanded for further factual findings to resolve employer's knowledge of the Essex manager's prior behavior and the content of claimant's final conversation with the regional manager.

¶ 19. In any event, the findings as they exist compel a conclusion that claimant had good cause attributable to his employer to leave his employment. The majority's analysis dismisses the abuse claimant suffered in the Burlington store as irrelevant and concludes that the angry outbursts of the Essex manager do not provide a basis to quit because they were not directed personally at claimant. I

---

dure highlights two additional reasons for the hearing officer to make a complete record. First, because most parties are not represented at the initial hearing, the hearing officer has an obligation to bring out important facts. See *Langlois v. Dep't of Emp't & Training*, 149 Vt. 498, 500, 546 A.2d 1365, 1367 (1988) (explaining that the hearing officer owes the claimant "every assistance in presenting his case consistent with the referee's duty to impartially decide the issues" (quotation omitted)). Second, because the Board simply reviews, and often adopts, the hearing officer's findings, it is extremely important for the hearing officer to fully develop the facts at that stage of the proceeding.

disagree with both of these contentions. Claimant's quit meets the test for good cause, which is "what a reasonable person would have done in the same circumstances." *Isabelle v. Dep't of Emp't & Training*, 150 Vt. 458, 460, 554 A.2d 660, 661 (1988). The behavior of claimant's managers is beyond what a reasonable person should have to endure in the workplace. While the majority excuses the Essex manager's actions because they were not directed specifically at claimant, there is no requirement that intolerable working conditions result from inappropriate behavior by coworkers or supervisors that is specifically directed at the claimant. See *Wetterhahn v. Kimm Co.*, 430 N.W.2d 4, 6 (Minn. Ct. App. 1988) (explaining that a co-worker's harassment does not need to be focused on claimant for it to provide an adequate basis for leaving employment). Claimant was not required to continue suffering through another angry and abusive store manager. See *Eulo v. Fla. Unemployment Appeal Comm'n*, 724 So. 2d 636, 638 (Fla. Dist. Ct. App. 1999) ("An employee is not required to accept undue verbal abuse from an employer."); *Chapman v. Indus. Comm'n*, 700 P.2d 1099, 1103 (Utah 1985) (Stewart, J., concurring) ("When minimum standards of civility in the work place are cast aside by supervisors, workers are not required to bear unreasonable abuse that is heaped on them."). Not only did the store manager display the same angry temperament that claimant had experienced in Burlington, but the Essex manager also made a disturbing threat to kill. The majority's claim that this comment was just "blowing off steam" and that claimant did not take it seriously because he returned to work two days later is simply unsupported. *Ante*, ¶ 8. Claimant missed a day of work because he was so disturbed by the comment. That he returned the following Monday to try and resolve the situation, as he is obligated to do, cannot be counted against him.

¶ 20. Furthermore, I disagree that claimant failed to allow employer an opportunity to rectify the situation prior to leaving. See *Allen v. Dep't of Emp't & Training*, 159 Vt. 286, 290, 618 A.2d 1317, 1319 (1992). Claimant made several attempts to resolve the hostile situation that he was enduring both in the Burlington and Essex stores. While he was working in the Burlington office, claimant spoke with the regional manager and eventually was transferred to a new store. The majority's conclusion that this grievance "was resolved," *ante*, ¶ 10, and the referee's assessment that employer's transfer of claimant to the Essex store demonstrates that employer was "responsive to legitimate concerns" are contrary to the facts. It can hardly be seen as an appropriate response where employer's resolution of the problem was to put claimant in a store that employer knew was managed by a person with a volatile temper. Employer did not actually respond to the source of the problem — the store manager's behavior. Employer did not discipline the Burlington manager or refer him for anger management therapy, as company policy allowed. Employer's sole response was to speak with the manager, something employer had done previously without any resulting change in the manager's behavior. See *Lebakken v. Express-A-Button, Inc.*, No. A07-1043, 2008 WL 2343269, at *4 (Minn. Ct. App. Jun. 10, 2008) (explaining that employer's act of "simply admonish[ing] a highly disruptive employee in hopes that he or she will improve" does not give victimized employee any reasonable expectation of assistance).

¶ 21. Given this background, claimant made a reasonable attempt to resolve his problems with his Essex manager before leaving. Claimant left a message with management following his Essex supervisor's day-long tirade on April 23. That management did not receive or failed to respond to this message is not claimant's fault. Claimant returned to work, despite his fear regarding his store manager's behavior. On his final morning at work, he met with his regional supervisor and described the angry and volatile behavior of his store manager. Given employer's failure to adequately address the first hostile work environment in the Burlington location, and employer's refusal to deal with the management situation at the Essex location, claimant's assessment that further efforts would be futile was reasonable. See *Turco v. Dep't of Emp't Sec.*, 141 Vt. 135, 138, 446 A.2d 345, 347 (1982) (concluding that employee was justified in leaving where there was history of harassment and employer had knowledge of it and refused to address the problem); see also *Rushlow v. Dep't of Emp't & Training*, 144 Vt. 328, 331, 476 A.2d 139, 141 (1984) (explaining that an employee must make an effort to remedy poor working conditions unless the effort "would be unavailing").

¶ 22. While there were additional steps claimant may have taken, claimant was not required to do everything possible to rectify the situation, only what was reasonable. "An employee can be required to do no more than make a reasonable effort . . . to bring his grievance to the attention of his employer." *Garcia v. Dep't of Emp't & Training*, 145 Vt. 331, 337, 488 A.2d 762, 766 (1985); see *Swain v. Dir., Dep't of Workforce Servs.*, 283 S.W.3d 603, 604-05 (Ark. Ct. App. 2008) ("The law does not require a worker to exhaust every possibility in an effort to rectify mistreatment and abuse, but instead requires only that which would be reasonable for an average employee under the circumstances."). The unemployment compensation statute is to be read liberally in favor of claimants, *Howard v. Dep't of Emp't & Training*, 153 Vt. 614, 616, 572 A.2d 931, 932 (1990), and claimant should not be refused compensation simply because he did not also relate the Essex manager's threat to kill 100 people.

Claimant had legitimate concerns about his work environment and made a reasonable effort to' explain these problems to management. His effort to resolve the issues was met with indifference from his employer. Claimant's action was reasonable and he was justified in leaving. I would reverse the Board and award claimant compensation.