2011 VT 87

## In re JLD Properties of St. Albans, LLC

[30 A.3d 641]

No. 10-097

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 5, 2011

*Jon Groveman* and *Jared M. Margolis*, Vermont Natural Resources Council, Montpelier, for Appellants.

*Stewart McConaughy*, *Robert F. O'Neill* and *Ross A. Feldmann* of *Gravel and Shea*, Burlington, for Appellee JLD Properties of St. Albans, LLC.

*David A. Barra* of *Unsworth & Barra, PLC*, Essex Junction, for Appellee Town of St. Albans.

¶ 1. **Johnson, J.** This is an appeal from an Environmental Court decision granting site plan, conditional use, subdivision, and Act 250 permits for the development of a large retail Wal-Mart store in the Town of St. Albans. Appellants are comprised of a number of interested individuals and groups opposed to the project. They contend the trial court erred in: (1) approving site plan and conditional use permits despite the alleged conflict of interest of several members of the Town's development review board; (2) finding that the subdivision is compatible with adjacent land uses; and (3) concluding that the developer may reapply for an Act 250 permit despite an earlier denial. We affirm.

¶ 2. This is the latest skirmish in a long-running dispute over plans to develop a Wal-Mart discount retail store on an undeveloped 100-acre parcel adjacent to Route 7 just north of the City of St. Albans and south of the boundary with the Town of Swanton.

In September 1993, the St. Albans Group — the project's original developer — applied for an Act 250 permit to build a proposed 126,090 square-foot Wal-Mart store on the site. The District No. 6 Environmental Commission granted the permit but the Environmental Board reversed, concluding that the proposal failed to meet several review criteria. The Board authorized reconsideration of the application, however, if the developer provided "a credible study of secondary-growth impacts." *In re Wal*Mart Stores, Inc.*, 167 Vt. 75, 79, 702 A.2d 397, 400 (1997). Rather than apply for reconsideration, the developer chose to appeal. We affirmed, upholding the Board's finding that the proposed store would "accelerate and attract substantial secondary growth" under 10 V.S.A. § 6086(a)(9)(A) (Criterion 9(A))[1] and thus required additional evidence of "expected secondary growth and its associated costs and benefits to determine whether the project would cause an undue burden on the financial capacity of the town and region." *Id.* at 82-83, 702 A.2d at 402. We also affirmed the Board's conclusion that the term "growth" under Criterion 9(A) includes not only population but also economic and commercial growth. *Id.* at 85, 702 A.2d at 404.

¶ 3. In December 2005, some eight years after our decision and twelve years after the initial application, the original developer's successor-in-interest, appellee JLD Properties, filed a new Act 250 permit application to build a larger Wal-Mart store (about 147,000 square feet) on the same site. At roughly the same time, JLD applied to the Town's development review board (DRB) for site plan, conditional use, and subdivision permits for the project. The DRB granted the zoning permits in April 2008. The District Commission approved the Act 250 application the following month. All of the permits were subsequently appealed to the Environmental Court and consolidated for review.

¶ 4. The Environmental Court issued a decision in March 2009, disposing of several pretrial motions. The court rejected appellants' claim that the doctrine of res judicata barred the new Act 250 application. The court ruled, instead, that the successive-application doctrine controlled, but deferred deciding the matter

---

[1] This section provides, in pertinent part, that the District Commission must consider "the growth in population experienced by the town and region" and whether the proposed development "would significantly affect their existing and potential financial capacity to reasonably accommodate" the expected growth. 10 V.S.A. § 6086(a)(9)(A).

until disputed factual issues were resolved at trial. The court also addressed appellants' claim that conflicts of interest among several DRB members required that the case be remanded for a new hearing. The court found that appellants had "good reasons to be concerned that the DRB chair did not review the Wal-Mart application objectively." Nevertheless, it concluded that, "egregious as [his] statements were," the proper course was to "complete [the court's] *de novo* review of the pending applications." The court also rejected appellants' claim that five other DRB members were biased "simply because they [had] voted in favor of an earlier application."

¶ 5. An evidentiary hearing was conducted over several days in June 2009. Following the submission of additional briefing, the court issued its decision in January 2010, approving the project with conditions. In response to appellants' motion to alter, the court issued a revised judgment in May 2010, amending several of its earlier findings but not its decision granting approval. This appeal followed.

I.

¶ 6. We begin with the conflict-of-interest claim. It is beyond dispute that "[a] fair trial before an impartial decisionmaker is a basic requirement of due process, applicable to administrative agencies as well as to the courts." *Sec'y, Agency of Natural Res. v. Upper Valley Reg'l Landfill Corp.*, 167 Vt. 228, 234-35, 705 A.2d 1001, 1005 (1997). Municipal zoning hearings, "like any quasi-judicial administrative proceedings, must faithfully observe the rudiments of fair play." *In re Bassette*, 147 Vt. 359, 362, 518 A.2d 15, 16 (1986) (quotation omitted). Thus, it is settled that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); see, e.g., *Rissler v. Jefferson Cnty. Bd. of Zoning Appeals*, 693 S.E.2d 321, 329 (W. Va. 2010) (applying due process principles to hold that member of local zoning board should have been disqualified from considering application for conditional use permit based on conflict of interest).

¶ 7. It is equally settled that "[a]ll questions" regarding a decisionmaker's impartiality do not necessarily "involve [issues of] constitutional validity." *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); see also *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702

(1948) (observing that "most matters relating to judicial qualification [do] not rise to a constitutional level"). Indeed, as the United States Supreme Court has observed, opinions formed by a decisionmaker "on the basis of facts introduced or events occurring in the course . . . of prior proceedings . . . do not constitute a basis" for disqualification "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); see also *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (holding that disqualification of decisionmaker is not compelled by "[m]ere familiarity with the facts of a case" through prior proceedings). Nor is an administrative decisionmaker necessarily disqualified as a matter of law even where he or she "has taken a position . . . in public, on a policy issue related to the dispute, in the absence of a showing that he [or she] is not capable of judging a particular controversy fairly on the basis of its own circumstances." *Hortonville*, 426 U.S. at 493 (quotation omitted).

¶ 8. Although the disqualification standards are thus generous, and the decisionmaker enjoys a presumption of impartiality, *Ball v. Melsur Corp.*, 161 Vt. 35, 39, 633 A.2d 705, 709 (1993), the conclusion is unavoidable here that — at a minimum — the appearance of fairness was compromised by the participation of the DRB chair. At the time of the original Wal-Mart application, the chair was a member of the Town's selectboard, vigorously supported the project, and spoke on behalf of himself and the board at the DRB hearings. As noted, such public support would not be a conflict of interest per se. The chair's remarks, however, ventured beyond the merits of the issue into an ad hominem attack on appellant Vermont Natural Resources Council (VNRC), one of the interested parties that then, as now, opposed the project. He referred to the VNRC as the "sister agency of the infamous Conservation Law Foundation" and denigrated the group as intermeddling outsiders, asserting that it "needs a map to find Northwestern Vermont" and was comprised of "a bunch of elitists with nothing invested in the community." Later, in criticizing a report of the Northwest Regional Planning Commission (NRPC) that raised concerns about the project, he was quoted as stating that it was "a sad day when NRPC now qualifies to be lumped together with the VNRC . . . and CLF . . . as an organization devoted to their personal ideals rather than to the realities of growth."

▮▮ ¶ 9. As noted, only in "the most extreme of cases" is disqualification for bias constitutionally required, *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986), but this was such a case. The chair's remarks about the VNRC evinced "a deep-seated . . . antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. He expressed open contempt for the group as outsiders and elitists, implying that they were illegitimate participants in the proceedings before the board. Under the circumstances, appellant VNRC could hardly expect a fair and impartial hearing from the DRB chair. We conclude that his participation violated due process.

▮ ¶ 10. The separate question of a remedy remains. The trial court concluded that a de novo hearing would cure any harm resulting from the DRB chair's participation, and we agree. Although the United States Supreme Court has recognized that there may be circumstances where de novo review is inadequate to cure a due process violation, it has generally been in cases of systemic or "structural" error undermining public confidence in the procedural framework as a whole. See *Johnson v. United States*, 520 U.S. 461, 468 (1997) (explaining that "structural error . . . is a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself") (quotation omitted). Thus, in *Ward v. Village of Monroeville*, the Court found an inherent due-process violation in Ohio's system of trying traffic offenses in mayoral courts where a substantial portion of local revenues was derived from traffic fines and fees. 409 U.S. 57, 59 (1972). In these circumstances, the Court concluded that the mayor's "executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court," *id.* at 60, and thus "necessarily involve[d] a lack of due process of law." *Id.* (quotation omitted). The Court found unpersuasive the claim that any unfairness in this regard could be corrected "on appeal and trial *de novo* in the County Court of Common Pleas," rejecting the proposition that "the State's trial court procedure [could] be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication." *Id.* at 61.

¶ 11. The high court employed similar reasoning in *Vasquez v. Hillery*, holding that systematic racial discrimination in the selection of the grand jury "undermines the structural integrity of the criminal tribunal itself" and thus represented a fundamental flaw

that could not be "purged" by a subsequent fair trial and conviction. 474 U.S. 254, 260, 263-64 (1986); see also *United Church of Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 700 (7th Cir. 1982) (holding that statute which authorized medical commission to judge case in which it was also a party represented due process violation that de novo review did not remedy); cf. *In re Hunt*, 163 Vt. 383, 387-88, 658 A.2d 919, 922 (1995) (holding that petitioner's claim of individual judicial bias did not represent the sort of "structural error" that compelled reversal in *Vasquez*).

■ ¶ 12. In contrast to errors of a "structural" nature, due process violations resulting from an individual decisionmaker's personal bias have often been held to be subject to cure on de novo review. For example, in *Kelly v. Board of Education of Monticello Independent School District*, the court conceded that the appellant's prospect of receiving a fair hearing before a school board that had prejudged his case was "more illusory than real." 566 S.W.2d 165, 168 (Ky. Ct. App. 1977). Nevertheless, the court concluded that the appellant's right to a de novo evidentiary hearing in the circuit court was sufficient "to cure any deficiencies in the due process hearing at the Board level." *Id.* The Supreme Court of Pennsylvania reached a similar conclusion in *Katruska v. Bethlehem Center School District*, 767 A.2d 1051 (Pa. 2001), where a high school principal claimed that his demotion violated due process because a school board member's wife, also a high school employee, had testified at the hearing. The court concluded that, where the Secretary of Education was vested with plenary authority "to conduct a de novo review of the [board] proceedings," *id.* at 1055, and it was the Secretary's determination that was ultimately reviewed on appeal, the Secretary's "de novo review of the decision . . . ensured[d] that the requirements of due process [were] satisfied." *Id.* at 1056. *Katruska* was followed by *K. Hovnanian Pennslyvania Acquisitions, LLC v. Newtown Township Board of Supervisors*, 954 A.2d 718 (Pa. Commw. Ct. 2008), where — as here — it was alleged that a municipal zoning board considering a conditional use application was biased. The applicant received a de novo hearing in the trial court, however, and the appeals court concluded that, "[b]ecause the trial court conducted a *de novo* review in this matter, any prior due process problems were cured." *Id.* at 724; see also *Ross v. Med. Univ. of S.C.*, 492 S.E.2d 62, 72-73 (S.C. 1997) (holding that, despite due process concerns in medical committee's termination of tenured professor,

medical board's "independent consideration of [plaintiff's] grievance cured the constitutional violation").

¶ 13. We thus find ample support for the trial court's conclusion that any due process concerns arising from the participation of the DRB chair in the permit proceedings were effectively cured by the subsequent trial de novo in the Environmental Court. This does not, of course, mitigate the egregious lapse of judgment that gave rise to the due process claim in the first instance or excuse such disreputable conduct in the future. Nor can review in the Environmental Court absolve questionable conduct in the ultimate court of public opinion. That is an entirely separate matter, however, from the one we consider here.

¶ 14. As for appellants' corollary claim concerning the other DRB members, it is sufficient to recall that mere participation in an earlier proceeding does not, without more, demonstrate a disqualifying bias. *Liteky*, 510 U.S. at 555. As this was the sole basis of the due process claim concerning the other members, we find that it lacks merit.

## II.

¶ 15. We turn to appellants' assertion that the trial court erred in analyzing the Act 250 permit application under the successive-application doctrine. Citing the statute and rule governing reconsideration of Act 250 applications, appellants maintain that the Legislature "has provided that reconsideration is the *sole* remedy for reapplying for an Act 250 permit that has been denied." (Emphasis added.) The assertion is unpersuasive. The statute merely provides that, when an Act 250 permit has been denied, the applicant may apply for reconsideration within six months of the denial with an affidavit attesting that any identified "deficiencies have been corrected." 10 V.S.A. § 6087(c). In reviewing the application, the Natural Resources Board rule provides that a district commission may limit its "scope of review to those aspects of the project or application which have been modified to correct deficiencies" and that findings not otherwise affected by the proposed modifications are "entitled to a presumption of validity." Natural Resources Board Rule 31(B)(2), 6 Code of Vt. Rules 12 004 060-13. Together these provisions simply serve to encourage and reward timely reconsideration motions by obviating the need to relitigate any positive findings from the initial permit

proceeding. See *In re Times & Seasons, LLC Act 250 Reconsideration*, 2011 VT 76, ¶ 10, 190 Vt. 163, 27 A.3d 323 (observing that "the reconsideration process allows an applicant to maintain the benefit of initial affirmative findings made on the original application and to receive additional review only in those areas found deficient"). We discern nothing in the statute or rule, however, to prevent an applicant from reapplying after the six-month reconsideration period has expired, albeit without the benefit of the presumption.[2] See *id.* ¶ 16 (noting that, to take advantage of subsequent change in law, "applicant must begin the Act 250 process anew").

■■ ¶ 16. The trial court here thus correctly concluded that the new Act 250 application was not automatically barred by the failure to apply for reconsideration, but rather was governed by the successive-application doctrine. This conclusion was sound. As the court accurately observed, the doctrine's ability to strike the proper balance between finality and flexibility in municipal zoning decisions applies with equal force to the planning and environmental concerns underlying Act 250. See *In re Dunkin Donuts S.P. Approval*, 2008 VT 139, ¶¶ 9, 9 n.2, 185 Vt. 583, 969 A.2d 683 (mem.) (noting that successive-application doctrine "is an attempt to balance the competing concerns of flexibility and finality in zoning decisions," concerns that "have been treated extensively in the context of Act 250 permitting" as well). Under this doctrine, the general rule is that a board may not entertain a second application concerning the same property after a previous application has been denied "unless a substantial change of conditions ha[s] occurred or other considerations materially affecting the merits of the request have intervened between the first and second application." *In re Carrier*, 155 Vt. 152, 158, 582 A.2d 110, 113 (1990) (quotation omitted).

¶ 17. Assuming the doctrine applies, appellants alternatively contend the evidence fails to support the court's finding that circumstances had changed sufficiently in the last twelve years to

---

[2] Appellants also suggest that the Environmental Board order denying the original Wal-Mart application in this case provided that the developer's sole recourse was to apply for reconsideration. On the contrary, the order merely stated that "to be eligible for the procedure under 10 V.S.A. § 6087(c) and Rule 31(B), an applicant must correct the deficiencies in the prior denial." Nothing in the order or in the other Board decisions cited by appellants suggest that reconsideration is the exclusive means of reapplying for an Act 250 permit.

permit the new Act 250 application. In assessing the court's finding that the developer demonstrated the requisite change of circumstances to support its new application, our review is limited. The trial court determines the credibility of witnesses and weighs the persuasive effect of evidence, and we will not disturb its findings "unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." *In re Route 103 Quarry*, 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694 (quotation omitted). Thus, the court's findings may "not be disturbed merely because they are contradicted by substantial evidence" where "credible evidence" otherwise supports them. *In re Miller Subdivision Final Plan*, 2008 VT 74, ¶ 13, 184 Vt. 188, 955 A.2d 1200.

¶ 18. In reaching its decision here, the trial court relied principally on engineering and economic analyses showing that much of the potential secondary commercial growth that concerned the Board in 1993 had already occurred during the intervening years. Included in "this conglomeration of commercial developments within a mile-and-a-half radius of the proposed project site," the court found, were fifty-one new commercial enterprises, including fast-food restaurants, bank offices, automobile sales and service centers, and large retailers such as supermarkets and home supply centers. This extensive commercial development was facilitated, in turn, by the City's specific designation of the area as a "growth center" and extension of sewer lines. The court also found that the Board's original concern with the project's potential effect on other large discount stores in the area, specifically an Ames, Woolworths, and Ben Franklin store, was obviated by the fact that all three had since closed, so that — in fact — there was now evidence of need for a local discount store such as Wal-Mart. As thus summarized by the trial court, the evidence showed that "commercial growth is now encouraged for this area and that the proposed Wal-Mart will fill a void that now exists in the local discount retail market." Additionally, the court found that the Board's original concerns about the project's impact on population growth and its effect on educational services had largely evaporated because of declining school enrollment over the years, and that other potentially adverse economic impacts had been minimized or negated by the developer's pledge of financial investments and other benefits to the local municipalities. Accordingly, the trial court found "a significant change in the circumstances that led to the denial of the prior Wal-Mart

development proposal" sufficient to permit the new Act 250 application.

¶ 19. Appellants contend the trial court relied on flawed or insufficient evidence, or ignored conflicting evidence, in reaching this conclusion. In this respect, they claim that there was no evidence showing how the loss of three large discount stores had affected commercial growth in the area, thus undermining the trial court's finding that the fifty-one new stores represented substantial commercial growth and negated the Board's original concern about secondary growth. The record evidence disclosed, however, that even with the loss of the three major discount stores the total square footage of stores in the area had more than doubled since 1993, thus amply supporting the court's finding of significant new commercial expansion. Appellants also fault the trial court for failing to address the difference in square footage between the original and current Wal-Mart store proposals, but the record shows all of the expert analyses on which the court relied took account of the expanded proposal. Appellants additionally criticize the developer's secondary-growth analysis for failing to consider the project's impact on the development or expansion of shopping centers. The developer's expert economist specifically testified, however, that his secondary-growth study included the potential expansion or addition of shopping malls and concluded that further growth was unlikely in view of the several shopping centers already serving the area.

¶ 20. Appellants further allege flaws in the economic model used by JLD's expert to demonstrate little or no secondary-growth associated with other Wal-Mart stores in Vermont and the region. As noted, however, the evidence showed — and the trial court found — that "significant expansion in commercial development" in the area surrounding the St. Albans site had already occurred such that secondary growth was no longer a concern; thus, any evidence concerning secondary growth specifically related to Wal-Marts in other areas was largely superfluous. In essence, the trial court here found the substantial evidence adduced by JLD relating to secondary growth and its associated social and economic impacts to be more compelling and persuasive than the countervailing evidence adduced by appellants. Under the applicable standard of review, therefore, we have no basis to disturb the court's findings, or reverse its conclusion that signifi-

cant changes over the past twelve to fifteen years validated the new Act 250 application.

### III.

¶ 21. Lastly, appellants contend the trial court erred in finding that the project was "compatible with adjacent uses (especially agricultural)" under the Town's subdivision requirements. Town of St. Albans Zoning Bylaws and Subdivision Regulations § 220(3) (2006). In its initial decision, the trial court found that "[n]o adjoining property hosts agricultural uses," observing in this regard that the nearest agricultural operation is the Hudak farm, which it described as located in a "separate zoning district in the Town of Swanton" and physically separated from the project by Stevens Brook, a 55-acre buffer along Stevens Brook that the developer had pledged to preserve, and many adjacent commercial uses. In response to appellants' motion to alter, the court revised its decision to acknowledge that a portion of the Hudak farm is, in fact, located within the Town of St. Albans and the zoning district of the proposed Wal-Mart site and that Stevens Brook does not separate the project from a portion of the Hudak farm. The court further acknowledged that it had mistakenly referred to "adjoining" rather than "adjacent" property at several points in its original decision, and that — as appellants argued — adjacent could have a slightly broader meaning than adjoining, encompassing properties that are not only contiguous but also nearby or close but not necessarily touching. See Webster's II New Riverside University Dictionary 78 (1984) (defining adjacent as "close to" or "nearby"); *Vermont Marble Co. v. Eastman*, 91 Vt. 425, 454, 101 A. 151, 163 (1917) (noting that dictionary defines objects as adjacent "when they lie close to each other, but not necessarily in actual contact") (quotation omitted).

¶ 22. In reaffirming its decision, however, the court here underscored its earlier undisputed findings that numerous uses separate the Hudak farm operations west of Route 7 from the project site, including a town highway known as Jewett Avenue, Stevens Brook, a woodland, and a host of commercial properties and uses, including "the commercial developments known as Cobb Auto, Senesac Auto Body, Champlain Commons store complex, Progressive Auto Sales, and a storage and distribution facility." The trial court thus concluded that even substituting "adjacent" for "adjoining" the Hudak farm was not an adjacent property requiring a specific compatability analysis under the ordinance.

¶ 23. Appellants claim that the court erred in concluding that the terms "adjacent" and "adjoining" are identical and that JLD was not required to analyze the project's compatability with the Hudak farm because it did not actually touch the property boundary of the proposed Wal-Mart. This was not the court's reasoning. On the contrary, the trial court expressly acknowledged appellants' "somewhat convincing argument of *the difference* between the terms," although it observed that the difference was less "dramatic" than appellants claimed and that one dictionary referred to them as synonyms. (Emphasis added.) Appellants also dispute whether the project is, in fact, compatible with adjacent agricultural uses. Although the trial court suggested that the intervening commercial uses would "dilute" any impact on the Hudak farm, its ruling was predicated on a fact-specific determination that the Hudak farm was not adjacent to the project in the broader sense advocated by appellants, and thus did not trigger the subdivision requirement. Appellants have not shown that this finding was clearly erroneous or unsupported by any credible evidence. *In re Route 103 Quarry*, 2008 VT 88, ¶ 4; *In re Miller Subdivision Final Plan*, 2008 VT 74, ¶ 13. Accordingly, we find no basis to disturb it, or the judgment as a whole.

*Affirmed.*