NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 110

No. 2015-003

| | |
|---|---|
| Juanita Burch-Clay | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Civil Division |
| | |
| Debra J. Taylor, Individually and In Her Capacity | April Term, 2015 |
| as Superintendent of Schools, Rutland Central | |
| Supervisory Union | |

William D. Cohen, J.

William B. Miller, Jr. and Wanda Otero-Weaver of Langrock Sperry & Wool, LLP, Middlebury, for Plaintiff-Appellant.

Pietro J. Lynn and Sean M. Toohey of Lynn, Lynn & Blackman, P.C., Burlington, for Defendants-Appellees.

PRESENT: Reiber, C.J., Dooley, Skoglund and Eaton, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

¶ 1. **DOOLEY, J.** Plaintiff Juanita Burch-Clay sought review in Rutland Superior Court of the West Rutland School Board's decision to terminate her employment contract. The superior court affirmed the Board's decision, and plaintiff appealed to this Court, arguing that procedural defects invalidated her post-termination hearing and that the Board lacked just and sufficient cause for her termination. We affirm.

¶ 2. The following facts are undisputed, except where otherwise noted. In 2011, the Board hired plaintiff as principal of West Rutland School with a two-year contract beginning July 1, 2011. In February 2012, the superintendent conducted a staff survey concerning

plaintiff's performance and received both positive and negative comments. In response to the survey, the superintendent completed a "formative performance evaluation," dated February 28, in which she evaluated plaintiff in six performance areas. The evaluation addressed plaintiff's strengths and also noted areas for improvement. The superintendent testified that she shared the results of this evaluation with the Board at its March 14 meeting. In addition to the concerns raised in the superintendent's evaluation, the Board had developed its own concerns about plaintiff's performance.[1]

¶ 3.    Plaintiff's contract authorizes the Board to not renew her contract by providing written notice of its reasons for non-renewal on or before March 15. By letter dated March 14, the Board notified plaintiff of its decision not to renew her contract, citing "school climate" as the reason for non-renewal. The letter also stated that the Board would be willing to reconsider its decision upon plaintiff's successful participation in a remedial plan developed and approved by the superintendent and the Board. Plaintiff followed up with a letter dated March 19 expressing her desire to work collaboratively with the Board to address its concerns.[2]

¶ 4.    On April 2, plaintiff met with the superintendent and the Board to discuss the plan for remediation.    That same day, the Board provided plaintiff with a letter outlining "performance deficiencies and Board expectations that require corrective action by" plaintiff. The letter directed plaintiff to provide written summaries of specific actions that plaintiff planned

---

[1]  Plaintiff's theory of the case is that the Board was biased against her from the outset and that at the time it made the decision not to renew her contract in mid-March 2012, she had received only positive feedback from parents, staff, and the administration. Despite these claims, plaintiff provides no countervailing evidence. Nor does she dispute that the staff survey and formative evaluation contained negative feedback. Indeed she presented these exhibits in her printed case. Rather, plaintiff highlights the positive feedback while downplaying the concerns expressed by her colleagues.

[2]  After the Board's March 2012 non-renewal decision, several parents filed a lawsuit against the Board seeking declaratory and injunctive relief for alleged open-meeting law violations. After the superior court denied their motion for preliminary injunction, the parents withdrew the lawsuit. Plaintiff relies on this lawsuit in support of her conflict-of-interest claim, but it otherwise is not relevant to this case.

2

to take to address the problem areas discussed in the letter: student/parent favoritism, failure to foster inclusiveness, communication issues, and scope of authority/communication with the Board. The letter further stressed that "failure on [plaintiff's] part to meet the expectations set forth above will result in appropriate action by the Board." The letter provided no specific deadline for completion of the assigned tasks. The Board also directed plaintiff not to make any public statement about the status of her contract.[3]

¶ 5.     In a letter dated April 5, plaintiff acknowledged receipt of the April 2 letter and plan for remediation and indicated her commitment to the school and her desire to work with the Board on meeting its expectations. Around April 9, plaintiff posted an entry to the "Principal's Blog" on the school's website, indicating that it was her "understanding" that she would be continuing at the school during the next year and that she and the Board were "eager to work well together." On May 23, the superintendent sent plaintiff an email regarding plaintiff's discussions with parents and teachers about her contract status. The superintendent reiterated the need for confidentiality and again directed plaintiff not to speak publicly about the matter, warning her that "[f]ailure to do so will result in further disciplinary action." In a June 3 email to the superintendent, plaintiff admitted that she "inadvertently caused more talk [among the parents] by answering a query" about a recent meeting.

¶ 6.     On May 7 and May 21, plaintiff again met with the superintendent and the Board. Plaintiff had not yet prepared written responses to the Board's April 2 letter by the May 7 meeting but provided her responses at the May 21 meeting. The Board reviewed plaintiff's responses but at that time did not take action in reconsidering non-renewal of her contract.

---

[3] Plaintiff alleges that, the day after she received the April 2 letter, the Board chair had a conversation with a parent about plaintiff at the parent's place of business. She claims that the chair disclosed information from the Board's executive sessions about plaintiff's performance deficiencies. The parent testified to this conversation at the post-termination hearing, but the Board did not find his testimony credible.

¶ 7. On June 2, the superintendent arranged for plaintiff to consult with a former public school administrator to discuss the issues raised in the April 2 letter. In an email to the superintendent the following day, plaintiff expressed positive thoughts about the meeting with the former administrator, acknowledged and apologized for her actions that had "hurt the community," and reemphasized her eagerness to address the Board's concerns and improve her performance. Two days later, the Board chair forwarded to the rest of the Board members an email chain that contained communications from another school employee to parents and staff concerning plaintiff's performance, proposing a new governance model for the school, and supporting the Board's March 14 non-renewal decision. The email first had been forwarded to the superintendent, who wrote, "The last nail in the coffin?" before forwarding the message on to the Board chair. In his message to the other Board members, the chair briefly stated that the email was "not good" and mentioned future meeting dates.

¶ 8. The superintendent prepared a "summative evaluation" dated June 8, which highlighted many deficiencies raised in the earlier formative evaluation that had not yet been remedied. The superintendent twice met with plaintiff to review the evaluation, which plaintiff refused to sign, stating that she did not agree with it.

¶ 9. On June 21, the Board sent plaintiff a letter notifying her of its decision to affirm its March 14 non-renewal of her contract for the 2012-2013 school year. In its letter, the Board noted that plaintiff failed to timely submit her written responses regarding her performance deficiencies and Board expectations, as set out in the April 2 letter. The Board further stated that, upon reviewing and discussing the responses that plaintiff provided at the May 21 meeting, it concluded that plaintiff had not taken seriously the concerns set forth in the April 2 letter and had not "demonstrated a sincere commitment to address [those] concerns."

¶ 10. On the same day, the Board sent a second letter notifying plaintiff that the Board was initiating termination of her contract and would be meeting on July 11 to consider whether it

4

had cause to terminate her contract. The letter also notified plaintiff of her right to request a post-termination hearing. The termination letter explained that plaintiff's responses to the remediation plan and accompanying letter had been "uncooperative, untimely and insubordinate." It also addressed plaintiff's public statements about her contract status, the negative feedback provided in the superintendent's evaluations, and the Board's belief that that plaintiff's written responses showed "no serious consideration" of its concerns and "no sincere commitment" to address those concerns. This letter apparently was sent in an effort to provide an alternative route to terminating plaintiff's employment because plaintiff took the position that she had a two-year contract and that renewal into the second year was automatic. The case proceeded as a termination pursuant to this second letter, and the Board appears to have abandoned its non-renewal action.

¶ 11. A post-termination hearing was conducted over four days in July. The Board chair presided over the hearing until the last day, when he was called to testify against plaintiff on the matter of the parent who claimed that the chair had disclosed information about plaintiff from the Board's executive sessions. After appearing as a witness, the chair recused himself from further participation in the hearing, deliberation, and final vote on termination. The Board issued its final decision on August 12, concluding that it had just and sufficient cause to terminate plaintiff's employment contract. One member authored a dissenting opinion highlighting what she perceived was bias against plaintiff on the part of the Board chair and vice-chair from as early as fall 2011.

¶ 12. Plaintiff filed a motion in the superior court for review under Vermont Rule of Civil Procedure 74, raising claims of both procedural defects and a lack of just cause for her termination. The superior court found no error in the conduct of the hearing and concluded that the Board had just and sufficient cause for termination. Plaintiff renews her claims on appeal to this Court. She first argues that she was denied due process of law because: (1) the Board was

5

biased against her; (2) the Board had a conflict of interest based on participation in another lawsuit; (3) the Board chair improperly participated in the hearing as both the presiding officer and a witness; (4) the Board and the superintendent violated the Vermont Administrative Procedure Act (APA); (5) the Board abused its discretion in excluding relevant evidence; and (6) the Board and the superintendent violated Vermont's open-meeting law. She then argues that, in spite of these procedural defects, the Board failed to present evidence of just and sufficient cause for her termination. We affirm the judgment of the superior court and conclude that plaintiff was not denied due process and that the Board had just and sufficient cause for her termination.

¶ 13. The foundation for our review here is the statute governing the termination of public school principals, 16 V.S.A. § 243(d), and the procedural rule governing the scope of appeal from termination decisions of the school board, Rule 74. The controlling statute provides:

> During the term of a contract, a principal may be dismissed by the board for just and sufficient cause by written notice setting forth the grounds therefor. The board may provide that its order shall take effect immediately, or following a hearing. In either case, the principal shall be given an opportunity to request in writing a hearing within 15 days following delivery of the notice. Within 15 days following receipt of a request for hearing from the principal, the board shall conduct such a hearing. The clerk of the board shall advise the principal and the superintendent of the time and place of hearing by written notice at least five days before the date of the hearing. The hearing shall be in executive session unless both parties agree in writing that it be open to the public. The principal and any member of the board may present witnesses and written evidence and cross-examine witnesses, and the principal and the board may be represented by counsel. Either the principal or the school board may arrange for the taking of a verbatim record of the proceedings. After the hearing, the board shall affirm, modify, or reverse its earlier action. Within five days after the conclusion of evidence in the case, the board shall issue a written decision that includes findings of fact and conclusions of law. Within 30 days of the day the written decision is delivered, the principal may appeal to the superior court under the rules for appeals from decisions in contested cases.

16 V.S.A. § 243(d). What is most important here is that the statute vests in the Board the dual powers of initiating termination with a "written notice setting forth the grounds therefor" and

6

thereafter conducting the termination hearing, if requested, and issuing a written decision to "affirm, modify, or reverse its earlier action." Id. Although plaintiff challenges aspects of the process employed by the Board here, she has not alleged that the Board violated this governing statute. Indeed, it is the dual role of the Board as initiator of the termination and adjudicator of the grounds for termination, as required by the statute, that underlies plaintiff's procedural due process claim.

¶ 14. The last sentence of the statute states that "the principal may appeal [from the board decision] to the superior court under the rules for appeals from decisions in contested cases." Id. This sentence is a cross-reference to 3 V.S.A. § 815, which provides for judicial review of contested cases. Specifically, § 815(c) states that review of final agency action may be taken under the procedures provided in Rule 74. As we repeatedly have held, review under Rule 74 is presumed to be on the record developed in the administrative hearing, unless the statute clearly states otherwise.[4] See, e.g., In re Kwon, 2011 VT 26, ¶ 6, 189 Vt. 598, 19 A.3d 139 (mem.). The statute before us does not explicitly provide otherwise, and therefore review is on the record. The superior court conducted an on-the-record review, and plaintiff did not object to this procedure.

¶ 15. The standard of review in the superior court is deferential, id., and our review on appeal is the same as that of the superior court, 863 To Go, Inc. v. Dep't of Labor, 2014 VT 61, ¶ 8, 196 Vt. 551, 99 A.3d 629. We will uphold the Board's factual findings unless clearly erroneous and its conclusions of law if reasonably supported by the findings. Id. Our review of matters not within the scope of the Board's expertise, including alleged due-process violations and other questions of law, is plenary. Rodriguez v. Pallito, 2014 VT 18, ¶ 20, 195 Vt. 612, 93 A.3d 102.

---

[4] Section 815(b) of Title 3 sets forth a procedure by which the court may remand to the agency for the taking of additional evidence. No such request was made in this case.

¶ 16.    We begin with plaintiff's claims of procedural and evidentiary errors.  Plaintiff relies on three sources of law: the Vermont APA, 3 V.S.A. §§ 800-849; Vermont's open-meeting law, 1 V.S.A. §§ 310-314; and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. xiv, § 1.[5]  With respect to the APA, plaintiff alleges that the Board violated 3 V.S.A. § 813 by engaging in ex parte communications with the superintendent.[6]  The APA applies to state agencies, id. § 801(b)(1), and therefore does not apply to local school boards, Burroughs v. W. Windsor Bd. of Sch. Dirs., 141 Vt. 234, 236, 446 A.2d 377, 379 (1982) (so holding); see also In re Maple Tree Place, 156 Vt. 494, 497-98, 594 A.2d 404, 406 (1991) ("The APA does not apply to local boards or commissions.").  Because the APA does not apply to the school board proceeding before us, we do not reach the merits of plaintiff's claim of APA violations.

¶ 17.    We turn next to plaintiff's claim that the Board violated Vermont's open-meeting law.  Plaintiff argues that the "nail in the coffin" email chain, which was forwarded from the Board chair to the other members of the Board, violated the open-meeting law because it

---

[5]  Plaintiff raised neither the APA argument nor the general due-process arguments in her post-hearing memorandum of law.  Pieces of these arguments appear in objections made during the hearings but not to the extent and scope made in her brief to this Court.  The due-process arguments were made to the superior court, but it is not clear that plaintiff made the APA argument in that forum.  The Board and the superintendent have not raised a preservation argument, and we accordingly address the merits.

[6]  Plaintiff does not rely on the Municipal Administrative Procedure Act (MAPA), 24 V.S.A. §§ 1201-1210, although it appears on its face to apply here.  The MAPA applies only to four specific types of contested hearings, three of which clearly do not apply here.  Applicable here is § 1201(1)(D):

> A hearing by a municipal body which is not required by law to be conducted according to procedures establishes in this chapter, but which the municipality elects to conduct in accordance with this chapter.

The Board's conclusion in its final order of termination states that "[the Board] has attempted to comply with the requirements of MAPA."  We do not read this language as a binding election to conduct the hearing in accordance with MAPA.  In any event, we do not consider MAPA's applicability since plaintiff failed to raise it.

8

addressed official Board business in a non-public forum. See 1 V.S.A. § 312(a)(1) ("All meetings of a public body are declared to be open to the public at all times . . . ."). Plaintiff further argues that if we found an open-meeting law violation, the remedy would be to reverse the Board's decision to terminate her employment. We do not reach the question of whether this remedy would be proper because we conclude that plaintiff has not demonstrated a violation of the open-meeting law.

¶ 18.   Turning to the statute, "meeting" is defined as "a gathering of a quorum of the members of a public body for the purpose of discussing the business of the public body or for the purpose of taking action." Id. § 310(2). In 2013, the Legislature amended § 310(2) to include additional language specifying that a meeting "shall not mean written correspondence or an electronic communication, including e-mail . . . between members of a public body for the purpose of scheduling a meeting, organizing an agenda, or distributing materials to discuss at a meeting," provided that the communication is available to the public under the Public Records Act, 1 V.S.A. §§ 315-320.[7]

¶ 19.   The language of § 310(2), prior to amendment, compels a reading that is consistent with the Legislature's clarifying 2013 language. The definition of "meeting" under the earlier statute was limited to discussing business or taking action and did not include organizing agendas or distributing materials. We have explained that "[w]here, as here, a legislative body enacts a law clarifying an earlier law, the 'subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.' " Washington v. Pierce, 2005 VT 125, ¶ 33, 179 Vt. 318, 895 A.2d 173 (quoting Loving v. United States, 517 U.S. 748, 770 (1996)). We further have explained that "the later act can be viewed as the

_____

[7] Plaintiff does not argue that the Board violated the amended statute by failing to make the email chain publicly accessible. Therefore, we need not consider whether this language applies to emails sent before the effective date of the amendment. Of course, the underlying content of the email chain was sent to parents and staff of the school.

legislative body's interpretation of the earlier act 'in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting.' " Id. (quoting Erlenbaugh v. United States, 490 U.S. 239, 244 (1972)). It is clear in reading the earlier and amended legislative enactments together that the Legislature did not intend for the term "meeting" to encompass the distribution by email of information for discussion at meetings, as occurred here.

¶ 20. The "nail in the coffin" email merely forwarded the comments of the employee and the superintendent to the other Board members for discussion at upcoming meetings. No members of the Board discussed any business or took any action with respect to the contents of the email or any issue surrounding plaintiff's performance. At most, the Board chair indicated that the forwarded messages were "not good" and reinforced the need for the Board to move forward on resolving plaintiff's employment status. We therefore conclude that the Board did not violate Vermont's open-meeting law.

¶ 21. We turn next to plaintiff's claims under the Due Process Clause. As noted above, supra, ¶ 13, these claims more or less arise out of the nature of the Board's dual role in initiating termination of plaintiff's employment and adjudicating the grounds for her termination. Plaintiff alleges that she was denied due process because of the Board's alleged bias and conflict of interest, the multiplicity of functions by the Board chair, and the improper exclusion of relevant evidence.

¶ 22. We start with plaintiff's claim of bias. Plaintiff argues generally that the Board harbored animosity toward her and, based on its involvement in the non-renewal decision, prejudged the facts of the case such that she was denied a fair and impartial hearing. With respect to her claim of actual bias, plaintiff relies primarily on the dissenting opinion from the termination decision, which stated that the Board chair and vice-chair "have approached [plaintiff] with suspicion, lack of cooperation, and on occasion with outright hostility." The

10

dissent asserted that the chair and vice-chair decided in 2011 that they did not want plaintiff to "remain as our principal" and abused their authority to reach that end. Plaintiff alleges that

> actual bias is also evident in [the Board chair's] discussions with the Board and Superintendent, and in the preclusion of inquiry into such discussions, [and by] the final-nail-in-the-coffin email[, which] shows that the Board (adjudicator) and the Superintendent (prosecutor) were working together to prepare the strongest possible defense of a predetermined result.

Plaintiff further alleges that the presence of "apparent bias" is also sufficient to overturn the decision.

¶ 23.  We recognize that "[a] fair trial before an impartial decisionmaker is a basic requirement of due process, applicable to administrative agencies as well as to the courts." Sec'y, Agency of Natural Res. v. Upper Valley Reg'l Landfill Corp., 167 Vt. 228, 234-35, 705 A.2d 1001, 1005 (1997); see also Mathews v. Eldridge, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotation omitted)).  The presence of bias—or prejudgment, a form of bias—may preclude a fair and impartial hearing.  In re Davenport, 129 Vt. 546, 555, 283 A.2d 452, 456 (1971); see also Withrow v. Larkin, 421 U.S. 35, 46-47 (1975) (stating that "a biased decisionmaker [is] constitutionally unacceptable").  Bias may manifest itself in the form of either "actual bias" or the "probability of actual bias."  Withrow, 421 U.S. at 47.  We recently noted, however, that "only in 'the most extreme of cases' is disqualification for bias constitutionally required."  In re JLD Props. of St. Albans, LLC, 2011 VT 87, ¶ 9, 190 Vt. 259, 30 A.3d 641 (quoting Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821 (1986)).

¶ 24.  Three significant precedential decisions define the controlling law for this case— two from the United States Supreme Court and one from this Court.  In Withrow, 421 U.S. 35, the State Medical Examining Board conducted an investigation into whether a doctor had engaged in certain proscribed acts.  Based on the investigation, the Board filed a notice of a contested hearing on whether the doctor's medical practice license would be temporarily

11

suspended. The doctor sought an injunction against the Board to prevent the hearing, alleging that, because of the investigative role of the Board, it was biased and could not conduct an adjudicatory hearing consistent with the requirements of due process. The United States Supreme Court rejected this claim, noting that it is common for an administrative agency to receive the results of an investigation, to approve the filing of charges based on that investigation, and to then participate in the ensuing hearings on those charges. Id. at 56. The Court held that this procedure did not violate due process because "there is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of [law]." Id. at 57. In reaching its conclusion, the Court added that, although the presence of both investigative and adjudicative functions "does not, without more, constitute a due process violation," a court might conclude that "special facts and circumstances present in the case before it [make] the risk of unfairness . . . intolerably high." Id. at 58.

¶ 25.    Based on Withrow, the United States Supreme Court reached the same conclusion in Hortonville Joint School District No. 1 v. Hortonville Education Ass'n, 426 U.S. 482 (1976), a closer decision than the one here. In Hortonville, the school board conducted disciplinary hearings for several teachers who had gone on strike in violation of state law. At the hearings, the aggrieved teachers argued that the school board was not sufficiently impartial—because the strike at issue had been prompted by the board's failure to meet the teachers' demands—and that due process entitled them to an independent and unbiased decisionmaker. The Wisconsin Supreme Court held that the school board impermissibly was biased, and the United States Supreme Court reversed. The Court first noted the school board's broad statutory authority over the governance of the school district, including its power to negotiate employment terms and employ and dismiss teachers, id. at 487, and emphasized that it is not improper for the same board that unsuccessfully negotiated with the union to conduct the disciplinary hearings leading

12

to the teachers' dismissal, id. at 489-91. The Court then focused on the nature of the alleged bias, noting that the teachers must show some personal animosity or personal or financial stake in the outcome. Id. at 491-92. "Mere familiarity with the facts of the case gained by an agency in the performance of its statutory role," the Court explained, "does not . . . disqualify a decisionmaker." Id. at 493. Nor did the Court accept that anti-union animus was sufficient to show bias where the board was acting within its statutory authority. Id. at 492 n.4. The school board's involvement in the events giving rise to the decision to terminate employment, the Court further reasoned, "is not enough to overcome the presumption of honesty and integrity in policymakers with decisionmaking power." Id. at 496-97.

¶ 26.    A case before this Court, In re Davenport, 129 Vt. 546, 283 A.2d 452, involved facts that are analogous to those present here, and, even though the decision preceded Withrow and Hortonville, it is fully consistent with those decisions. In Davenport, the superintendent and the school board of the Hartford School District suspended three high school teachers as a consequence of a student walkout and demonstration during school hours. The notifications sent to each of the three teachers informed them of their right of appeal to the board. After a two-day hearing, the board ordered dismissal of the three teachers. The aggrieved teachers appealed the decision to the superior court, arguing that they were denied an impartial hearing because the school board participated in their suspension and conducted the final hearing. We rejected their claim and held that the board's dual role in ordering suspension and hearing the appeal did not deprive the teachers of a fair and impartial hearing. Id. at 555-56, 283 A.2d at 456. In reaching our decision, we considered the nature of the legislative enactment, which vests both administrative and judicial authority in the school board, and recognized that, although "problems of impartiality" may arise, such dual authority "is permissible when the combination is incidental to the primary governmental function of the administrative body." Id. at 555, 283 A.2d at 456. We emphasized that employees are entitled to a fair and impartial hearing before an

13

unbiased board but that only actual prejudice will preclude an impartial hearing. Id. As we stated, "Prior involvement in the subject matter of the hearing, of itself, will not work a judicial disqualification. And a claim of prejudgment founded on prior participation will not oust the only tribunal that has the authority to act in the premises." Id. Although Davenport was decided over forty years ago, we recently reaffirmed its rationale in JLD Properties, 2011 VT 87, ¶¶ 6-9.

¶ 27. On this record, plaintiff's claim of bias against the Board is controlled by Davenport and Hortonville, and we must affirm the decision of the superior court that there was no due-process violation based on bias. We stress that the statutory scheme charged the Board with the dual role of making non-renewal and termination decisions and adjudicating the sufficiency of the grounds for termination. The Board necessarily communicated about plaintiff's performance with the superintendent and others, resulting in the decision to initiate termination proceedings. The fact that the Board had thought about plaintiff's performance prior to the hearing is not dispositive, so long as it was open to consider the matter based on the evidence at the hearing. The Board's decision specifically addressed this point in response to plaintiff's challenges. The Board stated in its decision that it was required "to render its decision based on an impartial and unbiased review of the evidence submitted during the hearing." It acknowledged that the individual members had been involved in "some of the discussions and events that have led to this proceeding," given the Board's broad governance responsibility, but concluded that these actions did not prevent it from fulfilling its adjudicative responsibility.

¶ 28. We stress the limitation of the record. Because plaintiff chose to raise due-process challenges by appeal under 16 V.S.A. § 243(d), she must base her challenges on the record before the Board.[8] In adhering to this limitation, she relies heavily on the dissenting opinion of one Board member. The dissent's conclusions appear to be based on the Board's discussions over the entire period of their consideration of plaintiff's performance. For example,

---

[8] Plaintiff also brought an independent action in superior court.

14

the dissent concludes that the chair and vice-chair decided in 2011 that they no longer wanted to retain plaintiff as principal. We find no evidence in the record of any Board hearings on which this conclusion is based, and neither the dissent's statements nor plaintiff's brief to this Court points to any. We also endorse the superior court's observation that plaintiff's "attempt to rely on stray comments, contained either in speech or e-mail, by the Board expressing dissatisfaction with her or advocating in favor of her termination is unavailing. Comments such as these are unavoidable where the Board is entrusted by the community in the statutory process of making personnel decisions."

¶ 29. We are required by our standard of review to determine whether the Board's decision is supported by the record. The dissent's statements based on non-record observations or stray emails challenging the Board are not of any assistance to plaintiff's position. Even if we found record evidence to support the dissent's conclusions, if those conclusions are based on findings of fact not agreed to by the majority, we would have to conduct our review based on the majority's findings.

¶ 30. As summarized above, plaintiff has rolled into her bias allegations arguments related to the Board's involvement in a concurrent lawsuit, the Board chair's multiplicity of functions and recusal from the final decision, and the "nail in the coffin" email. We consider issues related to these claims separately below. We add only that, to the extent plaintiff's arguments rely on the testimony of the parent with whom the Board chair allegedly discussed plaintiff's performance, the Board's decision explicitly rejects that testimony as not credible. Reconciliation of conflicting testimony must be left to the Board.

¶ 31. We turn next to plaintiff's claim that the Board had a conflict of interest arising from a concurrent lawsuit filed by parents against the Board for open-meeting law violations. Plaintiff argues that the Board acted improperly as both adversary in defending itself against the parents' lawsuit and adjudicator in its role as decisionmaker in the post-termination hearing. She

again relies on the dissent's statement that the parents' action "backed the Board into a corner" and caused it to "seek further actions to make the non-renewal stick." For purposes of this analysis, we will accept that plaintiff's theory is valid, such that the presence of a lawsuit could prevent the Board from conducting a fair adjudication.[9]

¶ 32.    As noted above, supra, n.2, the parents withdrew their lawsuit after the superior court denied their motion for preliminary injunction on the ground that the parents showed no "likelihood of success." The court made this ruling before the commencement of the post-termination hearing. We conclude that plaintiff failed to demonstrate a conflict of interest that would prevent the Board from conducting the termination hearings and ruling on plaintiff's terminations.

¶ 33.    We turn next to plaintiff's claim that the Board chair's roles in both presiding over the hearing and testifying against plaintiff deprived her of a fair and impartial hearing. The issue arose when plaintiff presented as a witness a parent who supported plaintiff. The witness testified to two meetings with the Board chair in which the chair discussed his negative evaluation of plaintiff's performance. Initially, the Board ruled that this testimony was inadmissible because it was irrelevant. Before the last day of the hearing, however, the Board offered plaintiff the opportunity to present the evidence, so long as the Board chair could testify in response and then disqualify himself from participating in the final decision. Plaintiff did not object to this procedure, and it was implemented. Plaintiff, however, argued in the superior court that the Board chair's recusal came too late in the proceeding to overcome the prejudice of his dual role as witness and adjudicator. She makes the same argument here.

---

[9]    In this case, the Board never was an adversary of plaintiff in the lawsuit, and the lawsuit was related only tangentially to plaintiff's termination; rather, the Board was an adversary to the parents on the issue of whether the Board violated the open-meeting law. There is clearly a question of whether the specific lawsuit relied upon by plaintiff would create an unacceptable conflict of interest for the Board in ruling on plaintiff's termination.

16

¶ 34. Due process generally does not tolerate multiplicity of functions by a single individual in an adjudicative proceeding. In re Crushed Rock, Inc., 150 Vt. 613, 621-22, 557 A.2d 84, 89 (1988). The Board and the superintendent argue that the risk of impartiality may be avoided, however, if the individual recuses himself from the deliberations and final vote. Although we never have directly addressed this argument, we have recognized that recusal from the final decision cures a disqualified member's participation in an adjudicative proceeding. See, e.g., State v. Lund, 168 Vt. 102, 110-11, 718 A.2d 413, 418 (1998) (denying motion to vacate based on recused judge's participation in decision because vote was unanimous and judge's presence did not affect deliberations). Plaintiff responds that the Board chair, despite his recusal, "unquestionably influenced [the] conduct of the proceedings and recommendations to the Board during the first three days" of the hearing and that his participation as a witness testifying against her "demonstrates an actual conflict of interest."

¶ 35. We recently addressed a somewhat analogous situation in JLD Properties, 2011 VT 87. There, we considered potential due-process violations in a development review board (DRB) chair's failure to recuse himself from a proceeding for a permit to build a retail store. While serving as a selectboard member, the DRB chair personally had attacked the nonprofit environmental organization that opposed the permit. We held that the chair should have recused himself from participating in the DRB proceeding and that his failure to do so was a due-process violation. Id. ¶¶ 8-9. We further held, however, that the violation was cured on appeal by the Environmental Division's de novo review, noting that participation by the chair at the DRB level was not the kind of fundamental structural error that tainted the whole process of permit consideration. Id. ¶¶ 12-13.

¶ 36. We reach the same conclusion here. We note that, at the outset, plaintiff consented to the process that enabled the Board chair to testify if he recused himself from further participation. At best, plaintiff speculates that the chair may have tainted the deliberation in

17

discussion with other Board members, but there is no evidence in the record that any taint occurred. As the United States Supreme Court observed in Hortonville, such speculation is not enough to overcome the presumption of honesty and integrity in policymakers with decisionmaking power. 426 U.S. at 496-97. The Board members were aware that the chair was no longer part of the decisionmaking process when they agreed to the procedure that allowed the chair to testify, and we must presume the Board rendered a decision based on its own evaluation of the evidence.

¶ 37. We turn next to plaintiff's claim that the Board abused its discretion in excluding as evidence the "nail in the coffin" email. She argues that the email was "probative of the Board's improper motive and decision-making process" and "demonstrated the Board's prejudgment and the impermissible collaboration between the Board and the Superintendent." The Board's decision to exclude evidence is "highly discretionary" and will be reversed "only where discretion has been abused or withheld and prejudice has resulted." In re Lathrop Ltd. P'ship, 2015 VT 49, ¶ 90, ___ Vt. ___, ___ A.3d ___ (quotation omitted); see also Bombard v. Dep't of Labor, 2010 VT 100, ¶ 10 n.1, 189 Vt. 528, 12 A.3d 533 (mem.) (recognizing discretion of administrative board to exclude evidence).

¶ 38. As the record reflects, plaintiff attempted to introduce this email during her cross-examination of the Board chair, which concerned his alleged statements to a parent about plaintiff's performance. She had the opportunity to introduce the evidence during her case-in-chief but failed to do so. While it is true that the Board generally is not "free to exclude" evidence that is "competent, relevant, and material," In re Cent. Vt. Pub. Serv. Corp., 141 Vt. 284, 293, 449 A.2d 904, 909 (1982) (quotation omitted), it has the discretion to exclude evidence not within the limited the scope of the cross-examination, see V.R.E. 611(b) (providing that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness"). At the hearing, plaintiff objected to the limited

18

scope of her cross-examination of the Board chair, but makes no argument here as to why the Board should have allowed her to exceed the scope of the direct examination.

¶ 39.  We add that we do not attach the same significance to the email that plaintiff does.  As the superior court stated, any error in excluding the email was harmless because it "simply shows the types of discussion that occur before a school board makes the decision to terminate a principal."  It is likely that Board members were bombarded with communications from citizens and others supporting and opposing plaintiff's continued employment.[10]  It is also clear that the Board acted at the initiative of the superintendent, who forwarded the email to the chair.  Exploring every communication and its effect would have greatly lengthened the proceedings for little purpose.  We agree with the superior court that this email chain demonstrates no actual bias toward plaintiff.  We therefore conclude that the Board did not abuse its discretion in excluding the email and that plaintiff was not prejudiced by its exclusion.

¶ 40.  Finally, we address plaintiff's argument that the cumulative effect of the evidence shows apparent bias, if not actual bias.  The record certainly shows that personnel disputes in the context of public education can be controversial and divisive.  The Legislature has decided to place the responsibility for acting on personnel matters and adjudicating the validity of that action in an elected local school board.  Beyond the apparent conflict that adheres to these roles, the record does not support plaintiff's allegations of apparent or actual bias.

¶ 41.  As we have concluded that plaintiff's post-termination hearing was proper and involved no procedural defects, we turn to the merits of the Board's decision.  Plaintiff claims that the Board could not show just and sufficient cause for termination and argues that "public opinion almost uniformly favored" her and opposed her termination; that staff surveys, formative evaluations, and feedback from parents all were "uniformly positive" at least through March 1,

---

[10]  The underlying email from the employee indicates that some teachers had been contacting school board members.

19

2012; and that the superintendent acknowledged that as of March 1 there was "a positive collaborative school culture." Plaintiff also stresses that the Board did not review her February evaluation prior to its March 14 vote not to renew her contract and that it attempted non-renewal only two weeks after the superintendent's positive assessment. For these reasons, plaintiff argues that the Board's non-renewal decision "is simply not supportable." Plaintiff further stresses that the summative evaluation, which was "replete with generalized claims of insubordination," was not reviewed by the Board until its June 13, 2012 vote on termination. Essentially, plaintiff's argument is two-pronged: first, that the Board "aggressive[ly] manipulat[ed] the factual record"; and second, that there was insufficient evidence to support plaintiff's termination in spite of the manipulation. As noted above, supra, ¶ 15, our review of the Board's decision is deferential, particularly when reviewing the factual underpinnings of the Board's conclusions. 863 To Go, Inc., 2014 VT 61, ¶ 8 (reviewing factual findings for clear error).

¶ 42. As to plaintiff's claim that the Board's findings are unsupported by the record evidence, we find no clear error. First, plaintiff argues that feedback was positive through at least March 1, 2012, and that it was undisputed that the Board did not review the formative evaluation prior to its March 14 non-renewal vote. As to this point, the Board made findings that the February staff survey documented concerns about favoritism and faculty divisiveness. The Board noted that comments were both positive and negative but stressed that "many comments clearly pointed to issues of low morale and divisions on the staff that were attributed to actions of [plaintiff]." The Board further noted both the positive and negative feedback provided in the formative evaluation completed by the superintendent on February 28, and emphasized instances of plaintiff's resistance to Board directives, failure to meet timelines, and need for improvement in superintendent and Board relations. The Board's findings are supported by the staff survey and formative evaluation, both of which were admitted in evidence at the hearing. The

20

superintendent's testimony also supports the Board's findings that plaintiff's job performance was a cause for concern at this time. She testified that she had concerns about the negative feedback from staff, including issues of distrust, lack of transparency, micro-management, low morale, and dishonesty. She acknowledged that, while many of the survey responses indicated a "positive collaborative school culture," there were "very negative" responses from individuals who were "very very concerned." With respect to plaintiff's claim that that the Board did not review the evaluation prior to its March 14 vote not to renew her contract, the superintendent testified that she shared her evaluation with the Board at that very meeting. Plaintiff provides no evidence to support her claim that the Board never saw the evaluation. Plaintiff's claim that "[t]he attempted non-renewal, just 13 days after the Superintendent's assessment of a positive and collaborative school climate, is simply not supportable" is itself not supportable. The evidence demonstrates staff and superintendent concerns about plaintiff's performance, and we see no error in the Board's findings.

¶ 43. Second, plaintiff claims that the Board saw the summative evaluation for the first time during the June 13, 2012 meeting where it voted on her termination, viewing it "only briefly," and that therefore it could not have been "the impetus for the Board's decision" to terminate her. As the Board's findings demonstrate, however, the Board had concerns about plaintiff's performance even before the superintendent prepared the summative evaluation. Specifically, the Board noted plaintiff's failure to make progress toward completion of a remedial plan; its dissatisfaction with her responses to questions presented under the remedial plan; and her failure to abide by the Board's directive not to discuss her contract with the public. Plaintiff's failure to timely complete tasks assigned under the remedial plan and the Board's dissatisfaction with her responses are the precise reasons the Board provided in its June 21, 2012 letter informing plaintiff of its decision to affirm its March 14 non-renewal decision. Moreover, the superintendent's testimony supports the Board's finding that there was concern about

21

plaintiff's public discussion of her contract status. Specifically, the superintendent testified that the issue was discussed at a Board meeting and that at least one of the members stated that plaintiff was not authorized to make the comment, the comment was improper, and it did not reflect the Board's view. The Board makes no finding that the summative evaluation was the impetus of its decision. Rather, the Board's findings, as supported by evidence and testimony, demonstrate other considerations that led to the final termination vote.

¶ 44. Because we find no error in the Board's findings, we turn to its conclusion that it had just and sufficient cause for termination, which we review for reasonableness. Id. ¶ 8. Plaintiff makes no concrete argument here but merely asserts that the Board's findings do not support its conclusion that it had cause for her termination.

¶ 45. We previously have addressed the requirements for finding just and sufficient cause for an employee's termination and formulated a two-part test for determining whether there was just cause for dismissal: (1) whether "the employee's conduct was egregious enough that the discharge was reasonable" and (2) whether "the employee had fair notice, express or implied, that such conduct could result in discharge." Sarvis v. Vt. State Colls., 172 Vt. 76, 80, 772 A.2d 494, 497 (2001) (quotation omitted). We also have held that insubordination constitutes behavior egregious enough to warrant discharge, explaining that "[i]nsubordination is a serious offense because it weakens the confidence management has in an employee's reliability in carrying out directives from management." In re Hurlburt, 2003 VT 2, ¶ 23, 175 Vt. 40, 820 A.2d 186; see also In re Morrissey, 149 Vt. 1, 13, 538 A.2d 678, 686 (1987) (finding just cause for termination where employee undermined established policy and superior's authority).

¶ 46. As the superior court noted, the Board expressly cited insubordination as the reason for plaintiff's dismissal. The evidence supports the Board's conclusions that plaintiff failed to cooperate with and follow directives of the superintendent and the Board and that she had her own vision for the school that did not align with that of the Board. Further, the evidence

22

supports the Board's conclusions that plaintiff failed to make progress on the plan for remediation and address deficiencies in her performance and that she disregarded the Board's directive not to publicly discuss her contract. The Board reasonably concluded that this conduct amounted to insubordination requiring dismissal.

¶ 47. We also have held that "[k]nowledge that certain behavior is prohibited and subject to discipline is notice of the possibility of dismissal." In re Hurlburt, 2003 VT 2, ¶ 25 (quotation omitted). Here, plaintiff was aware that her job performance needed improvement. The superintendent discussed the evaluations with plaintiff, and the Board drew up a remediation plan and provided plaintiff with a letter outlining what she needed to do to address her deficiencies. She also received a warning from the superintendent that any further public discussion of her contract status would result in disciplinary action. She was fully aware that failure to progress with the plan, respond to the Board's concerns, and obey the Board's directives could result in termination of her contract.

¶ 48. Plaintiff has presented no evidence in support of her argument that the Board lacked cause. She merely wars with the Board's findings, relies heavily on the comments in the dissent, and recites, out of context, comments from the evaluation forms that she had fostered a "positive collaborative school climate." We therefore affirm the Board's decision that it had just and sufficient cause to terminate her employment contract.

Affirmed.

FOR THE COURT:

_____

Associate Justice

23