2004 VT 60

# Kenneth Laumann v. Department of Public Safety
# Robert Wheeler v. Ethan Allen, Inc.

[857 A.2d 309]

No. 03-105

Present: **Amestoy, C.J., Dooley, Johnson, Skoglund and Reiber, JJ.**

Opinion Filed June 25, 2004

*Thomas A. Zonay* of *Ford & Zonay, P.C.*, Woodstock, for Plaintiff-Appellant Laumann.

*Bernard D. Lambek, Robert Halpert* and *Patricia K. Turley* of *Zalinger Cameron & Lambek, P.C.*, Montpelier, for Plaintiff-Appellant Wheeler.

*Keith J. Kasper* of *McCormick, Fitzpatrick, Kasper & Burchard, P.C.*, Burlington, for Defendant-Appellee Department of Public Safety.

*William J. Blake* and *Wesley M. Lawrence*, Law Clerk, of *Kiel Ellis & Boxer*, Springfield, for Defendant-Appellee Ethan Allen, Inc.

¶ 1. **Skoglund, J.** Appellants Kenneth Laumann and Robert Wheeler (Claimants) appeal a decision of the Commissioner of the Department of Labor and Industry (Department) granting summary judgment in favor of Claimants' employers, Vermont Department of Public Safety and Ethan Allen. Claimants contend that the Commissioner violated statutory requirements of the Workers' Compensation Act when she ruled that the date claimants returned to work was the

operative date from which to calculate cost of living increases for permanent partial disability (PPD) benefits. Because the Commissioner's interpretation is consistent with the plain language of the relevant statutes and regulations, we affirm.

¶ 2. The facts of this case are not in dispute. Kenneth Laumann injured his back while working as a Vermont State Trooper. He reported for duty the following day and thus lost no time from work as a result of his injury. He reached medical end result after more than three and a half years from the date of the incident.[1] Laumann still suffered a permanent impairment, however, and was therefore entitled to PPD benefits. Upon reaching medical end result, Laumann and the Vermont Department of Public Safety entered into an agreement awarding him PPD benefits for a period of 52.25 weeks based on a 9.5% impairment rating.

¶ 3. Robert Wheeler injured his hand operating a wood chipper while working for Ethan Allen. Eight months passed before Wheeler was able to return to work. He reached medical end result for his injury about a year and two months after the date of the accident, but still suffered a permanent impairment. At that point, he entered into an agreement with Ethan Allen awarding him PPD benefits for a period of 52.65 weeks based on a 13% impairment rating.

¶ 4. In these two agreements, the date Claimants returned to work was used as the operative date for calculating cost of living increases for PPD benefits. Under this so-called "old methodology," once a claimant reaches medical end result and receives an impairment rating, PPD benefits are determined by taking two-thirds of the claimant's average weekly wage at the time of the injury, then making weekly payments until the total number of weeks are satisfied. If those payments extend beyond July 1, an annual cost of living adjustment was made.

¶ 5. After the parties signed the agreement, but before Claimants were paid, the Department developed a new way to calculate annual cost of living increases for PPD benefits. Under this "new methodology," once a claimant reaches medical end result and receives an impairment rating, the compensation rate for PPD benefits is deter-

---

[1] Medical end result "means the point at which a person has reached a substantial plateau in the medical recovery process, such that significant further improvement is not expected, regardless of treatment." Workers' Compensation Rule 2.1200, 3 Code of Vermont Rules 24 010 003-2 (2002).

mined after adding annual adjustments to the average weekly wage from the date of injury to the date of medical end result. The change in methodology would have had the greatest impact on Laumann because, with three and a half years between the date of injury and medical end result, he would have received $5000.00 more in PPD benefits. The impact would have been far less on Wheeler because only a year and two months passed between the date of injury and medical end result.

¶ 6. Citing the change to the "new methodology," the Department declined to approve the parties' PPD benefit agreements because they employed the "old methodology." The employers then sought a hearing before the Department and requested consolidation of their cases.[2] On January 5, 2003, the Commissioner issued a decision granting the employers' summary judgment motion. The Commissioner based her ruling on the fact that the "old methodology" represented the most consistent reading of the statutory language and applicable regulations. Claimants appealed.

¶ 7. This Court's review is limited to questions of law that the Commissioner has certified, see 21 V.S.A. § 672, and is tempered by the considerable deference we must accord her ruling. "The Commissioner's decision is presumed valid, to be overturned only if there is a clear showing to the contrary." *Wood v. Fletcher Allen Health Care*, 169 Vt. 419, 422, 739 A.2d 1201, 1204 (1999). "Absent compelling indication of an error, interpretation of a statute by an administrative body responsible for its execution will be sustained on appeal," unless it is unjust or unreasonable. *Bedini v. Frost*, 165 Vt. 167, 169, 678 A.2d 893, 894 (1996). To make this determination we "look to the whole statute, its effects and consequences, and the reason and spirit of the law to determine whether the Commissioner's interpretation conflicts with the Legislature's intent." *Clodgo v. Rentavision, Inc.*, 166 Vt. 548, 550, 701 A.2d 1044, 1045 (1997).

¶ 8. The Commissioner certified the following question for our consideration: what is the proper method of calculating cost of living increases on permanency benefits for claimants who have lost no time from work, or who returned to work before reaching medical end result for their work-related accidents? In answering this question, the Commissioner held that "[b]ecause the 'old methodology' is consistent with the Act and the Rules, it must control the calculation of perma-

---

[2] There were three claimants in the case before the Commissioner, Laumann, Wheeler, and Annette Lamarre. Ms. Lamarre is not party to this appeal.

nency benefits." She based her decision on the fact that "neither the Act nor the Rules refer to a medical end result date in the context of calculation of compensation benefits" and, as such, she would not read that language into the statute. The Commissioner also noted that the Legislature "could have chosen the medical end result date, but [] did not." Instead, it chose the date of termination of temporary disability, i.e., the date the employee returns to work, as the point at which PPD benefits are payable.

¶ 9. Claimants argue that the Commissioner's interpretation of the statutes is unjust, unreasonable, and inconsistent because PPD benefits cannot be paid out until an injured party reaches medical end result and an impairment rating can be determined. Claimants insist that any annual cost of living adjustments should be calculated from the date of medical end result going forward, thus giving them the benefit of any increases from the date of injury to medical end result. The employers counter that the Legislature intended to initiate weekly PPD benefit payments upon the termination of temporary total disability benefits, and not the medical end result date. To read it any other way, the employers argue, would result in a windfall to the Claimants in this case — who lost no time from work or who returned to work before medical end result — because between the time they returned to work and medical end result, they were working and receiving their wages along with any annual adjustments from their employers to which they were entitled.

¶ 10. To resolve this dispute, we must review the Commissioner's interpretation of the Workers' Compensation Act. "Our goal in interpreting statutes is to effect the intent of the Legislature, which we attempt to discern first by looking to the language of the statute." *Russell v. Armitage*, 166 Vt. 392, 403, 697 A.2d 630, 637 (1997). When the meaning of a statute is plain on its face, we need not resort to construction and must enforce it according to its stated terms. See *id.*

¶ 11. Payment of PPD benefits is governed by 21 V.S.A. § 648, which states:

> Where the injury results in a partial impairment which is permanent and which does not result in permanent total disability, compensation shall be paid during the period of total disability, as provided in sections 642 and 643 of this title, and at the termination of total disability, the employer shall pay to the injured employee 66 2/3 percent of the average weekly

wage, computed as provided in section 650 of this title, . . . for a period determined by multiplying the employee's percentage of impairment of the whole person by 330 weeks. The percentage of impairment to the whole person is the percentage of impairment to the particular body part, system, or function converted to the percentage of impairment to the whole person as provided in subsection (b) of this section.

21 V.S.A. § 648(a). Section 650 provides the method for calculating average weekly wages for purposes of PPD benefits. Under the statute, a claimant's average weekly wage is calculated to approximate his wages at the time of injury. See 21 V.S.A. § 650(a) ("Average weekly wages shall be computed in such manner as is best calculated to give the average weekly earnings of the worker during the twelve weeks preceding an injury . . . ."). Annual adjustments are computed according to subsection (d), which states that "[c]ompensation computed pursuant to this section shall be adjusted annually on July 1, so that such compensation continues to bear the same percentage relationship to the average weekly wage in the state as computed under this chapter as it did at the time of injury." *Id.* § 650(d). This calculation method is restated in Department regulations, which provide that "[t]he compensation rate for permanent partial or permanent total disability compensation shall be 2/3rds of the claimant's average weekly wage, taking into account any annual adjustments in compensation rate required by 21 V.S.A. § 650(d) from the date of injury." Department of Labor and Industry, Administrative Division, Vermont Workers' Compensation and Occupational Disease Rules § 15.1000, 3 Code of Vermont Rules 24 010 003-16 (2001).

¶ 12. After reviewing the relevant statutes, we find no compelling indication of error in the Commissioner's interpretation of the Act. The Legislature made a decision as to when, how, and for how long permanently impaired claimants were eligible for PPD benefits and made that intention clear in the plain language of § 648 and § 650. Section 648(a) describes when PPD benefits are payable: at the termination of total disability. The same subsection sets forth the general principle of how benefits are calculated: two-thirds of the claimant's average weekly wage defined and computed according to § 650. Finally, § 648(a) defines how long a claimant is eligible for PPD benefits: a period of weeks determined by multiplying the percentage of impairment by 330 weeks.

¶ 13. Claimants are correct that this last step, the percentage of impairment, cannot be determined until medical end result, see 21

V.S.A. § 648(a), (b), but that does not change the fact that the percentage of impairment and medical end result date have no bearing on the method of calculating the amount of the PPD benefit and annual adjustment owed. The only portion of the PPD benefit determination directly affected by the medical end result date is how long claimants will be eligible for PPD benefits. When benefits are to be paid and how much each payment and cost of living increase should be is clearly laid out in the statutes and hinges, not on medical end result, but on the date of termination of total disability and the date of injury.

¶ 14. The date of termination of total disability expressly reflects the Legislature's choice as to when PPD benefits "compensation shall be paid." See 21 V.S.A. § 648(a). Similarly, the date of injury is referenced in each section relating to the calculation of the amount of the benefit due and the cost of living increases applicable in each case. See *id.* § 650(a), (d); Rule 15.1000. Furthermore, as the Commissioner pointed out, this is logical "because it reflects what was earned when one was injured" and evidences the Legislature's intent to connect PPD benefit payments to wages and annual adjustments that would have been due while the claimant was injured. Even if an impairment rating cannot be determined until medical end result, that date is not relevant to the actual calculation of PPD benefits and the associated annual cost of living increases. This interpretation best harmonizes the plain language of the statutes and effectuates the Legislature's intent.

¶ 15. To find otherwise would result in a windfall for claimants like these who either lost no time from work or returned to work before reaching medical end result. When a claimant returns to work immediately or before medical end result, he receives his salary and any annual adjustments earned during this period of time and, therefore, would not be deprived of any cost of living increases to which he was entitled. To add an additional cost of living adjustment for this period would give Claimants a double benefit not intended by the Legislature.

¶ 16. Finally, in its brief Ethan Allen challenged the implementation of the "new methodology" arguing that the Department failed to comply with the Vermont Administrative Procedure Act when it changed the method by which it calculates PPD benefits and annual cost of living increases. Because we find the "old methodology" consistent with the relevant statutes, we need not address this claim.

*Affirmed.*