NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 61

No. 25-AP-054

In re Holland Cannabis, LLC

Supreme Court

On Appeal from
Cannabis Control Board

September Term, 2025


Maxine Grad, Appellate Officer

Stuart W. Revo, Manchester Village, for Plaintiff-Appellant.

Charity R. Clark, Attorney General, and Alison L.T. Powers, Assistant Attorney General,
  Montpelier, for Defendant-Appellee.


PRESENT: Reiber, C.J., Eaton, Cohen and Waples, JJ., and Morrissey, Supr. J.,
          Specially Assigned


¶ 1.     **WAPLES, J.**   Holland Cannabis, LLC, appeals from an appellate officer's order affirming the Cannabis Control Board's decision to revoke Holland's license to cultivate cannabis for commercial sale. We affirm.

¶ 2.     The Cannabis Control Board is responsible for licensing cannabis cultivators, propagators, product manufacturers, wholesalers, retailers, and testing laboratories—collectively, "cannabis establishments"—to engage in commercial cannabis activity. 7 V.S.A. §§ 861(8), 901. The Board is also tasked with administering a compliance-and-enforcement program for its licensees. Id. §§ 843(b)(2), 861(8). This obligation encompasses, as relevant here, enforcing the statutory prohibition on offering "[]adulterated" cannabis for sale. Id. § 904(e)(1). The Legislature

further charged the Board with adopting rules governing the "pesticides or classes of pesticides" that cultivators may use, id. § 881(a)(2)(A)(ii), and the Board accordingly promulgated a rule defining "adulterated" cannabis to include any product that "falls outside of action levels or established tolerances specified in Board testing guidance" or "contains any additive or substance that may . . . present an enhanced risk to human health." Cannabis Control Board Rule 2.1.3, Code of Vt. Rules 25 000 002 [hereinafter Board Rules], http://www.lexisnexis.com/hottopics/codeofvt rules.

¶ 3.     The Board is "empowered to conduct investigations of all persons who engage in the sale or transfer of Cannabis or Cannabis Products to ensure compliance with" the Board Rules and statutory requirements. Id. at 4.2.1.  Licensees must cooperate with such investigations and "shall give the Board and Board designees immediate access to facilities and records upon request, including access to their physical site of operations." Id. at 4.3.2.  If the Board identifies a violation of its regulations or related law, it may initiate an enforcement action by issuing a notice of violation. Id. at 4.4.1., 4.8.1.  The notice of violation must include, among other things, the factual basis for the violation or violations, penalty or penalties to be imposed, and any necessary health-and-safety orders. Id. at 4.8.2.  Potential penalties include corrective-action plans, administrative fines, and license suspension or revocation. Id. at 4.4.2, 4.5.

¶ 4.     Penalties imposed by a notice of violation generally do not take effect until the respondent has an opportunity to contest the notice. Id. at 4.9(a).  Board Rule 4.10 establishes an exception: if a notice of violation is accompanied by "a written finding that the licensee's violation poses an imminent threat to public health, safety, or welfare," it may be issued with immediate effect. Id. at 4.10.  In these instances, the respondent retains the opportunity to contest the notice of violation by filing a written response specifically identifying each issue and fact in dispute. Id. at 4.10(b).  If the notice contemplates suspension or revocation of the respondent's license or establishment card, the respondent may request a hearing before the Board. Id. at 4.10(e).  Where

2

the supporting facts are disputed, the Board may not find that a violation occurred unless the finding is supported by a preponderance of the evidence.  Id. at 4.10(f).

¶ 5.    With this understanding of the relevant aspects of the regulatory framework, we turn to the procedural history of this case.  Holland was previously licensed by the Board as a tier-2 cannabis cultivator.  In May 2024, pursuant to Board Rule 4.10, the Board issued a notice of violation with immediate effect against Holland.   In the notice, the Board alleged that myclobutanil—a pesticide categorically prohibited for use in Vermont cannabis cultivation because it may cause illness in humans if swallowed, inhaled, or smoked—was detected in retail samples of cannabis products cultivated by Holland.  The notice also alleged three violations of the Board Rules: (1) intentionally concealing evidence of a violation, in contravention of Rule 4.5.1(c); (2) failing to abide by a corrective action plan as required under Rule 4.5.1(d); and (3) using unauthorized pesticides, soil amendments, fertilizers, or other crop-production aids in violation of Rule 4.5.2(m).  It included a written finding that these violations posed an imminent threat to the public health, safety, and welfare by placing adulterated cannabis, which may be hazardous to human health, into the stream of commerce.  On this basis, the Board issued several orders with immediate effect, including an order directing retail cannabis establishments and manufacturers to stop the sale of all of Holland's products and requiring that Holland cease all new cultivation activities or cannabis sales and initiate a recall procedure.  The contemplated penalties included an administrative fine of $20,000 and revocation of Holland's cannabis-establishment license.

¶ 6.    Holland timely contested the notice of violation and requested a hearing before the Board.  It raised numerous arguments in its written response.  As relevant here, Holland contended that: (1) the creation and existence of the Board violate the principle of separation of powers set forth in the Vermont Constitution, and as a result, the Board lacked authority to take any punitive action against Holland; (2) the Board chair had made public statements pertaining to the case

3

demonstrating that he was not impartial and had already prejudged its outcome, making it impossible for Holland to receive a fair hearing; and (3) the stop-sale order was issued absent an appropriate opportunity for due process.

¶ 7. The Board chair issued a procedural order clarifying that the only question to be determined at the upcoming hearing was whether a preponderance of the evidence demonstrated that the alleged violations occurred—in other words, whether Holland "used myclobutanil in its cultivation operations after its 2023 violation for the same conduct." While the procedural order recognized Holland's challenges to the Board's existence and the process afforded in connection with the stop-sale order, it explained that these issues were not cognizable in the pending license-revocation proceeding.

¶ 8. At the outset of the Board hearing in June 2024, Holland moved for the chair to recuse himself based on his alleged public statements. The chair denied the motion. The Board then heard testimony from three witnesses: a Board compliance agent; the president and founding partner of one of the laboratories that tested Holland's samples; and a Holland employee responsible for cannabis testing and compliance. It issued a written decision and order later that month which included the following factual findings.

¶ 9. Myclobutanil is the active chemical compound in several commercial fungicides. In Vermont, it is prohibited for use in cannabis cultivation. Cannabis flower harvest lots and cannabis products must be tested for myclobutanil prior to registration or sale. Cannabis is analyzed for pesticides using laboratory testing that delivers a certificate of analysis reporting the sample's content. Every cannabis cultivator must have "clean" certificates of analysis to move its product forward into the market. Board compliance agents also randomly test retail samples to determine whether the product originally tested matches the product ultimately offered for sale— a practice the Board described as "the last bulwark against test evasion and sample fraud."

4

¶ 10. In 2023, prompted by consumer complaints of illness, the Board investigated Holland. Holland entered an agreed disposition and corrective-action plan with the Board in June of that year. Thereunder, Holland agreed that it would: not contest several violations the Board assessed against it in relation to adulteration of its cannabis with myclobutanil; participate in a six-month remediation period during which it was prohibited from engaging in cannabis commerce; pay administrative penalties of $27,000; and be placed on a two-year corrective-action plan intended to ensure Holland was prepared to manage pests and pathogens without using prohibited pesticides.

¶ 11. In late March 2024, two Board compliance agents were conducting random sample testing at several cannabis retailers. At one of these retailers, Kushies, the agents collected four samples of Holland's product. In early April, a laboratory returned certificates of analysis showing that two of the four Holland samples contained quantifiable detections of myclobutanil. The next day, one of the Board compliance agents contacted the Holland employee responsible for testing and compliance to advise her of the adverse results and arrange for further testing of Holland's product. The employee promptly contacted Kushies to buy back product. The employee advised the compliance agent, however, that Holland was presently unavailable for on-site testing.

¶ 12. The agent gathered twenty-one additional samples of Holland's product from Kushies. Laboratories returned certificates of analysis showing quantifiable detections of myclobutanil in both flower and pre-roll samples. Because Holland professed to still be unavailable to allow agents to collect samples on site, this testing did not occur until twelve days after the agent initially requested access to Holland's facility. Several of the on-site samples, which were gathered from various rooms within the facility, returned certificates of analysis reflecting the presence of myclobutanil.

¶ 13. The Board encouraged Holland to cooperate with a recall of its products and Holland signaled an intention to do so. But while Holland voluntarily took back its pre-rolls from

retailers, it did not make any public announcement warning consumers who may already have purchased adulterated cannabis products. A compliance agent elsewhere in the state learned that a retailer had been led to question the validity and seriousness of the problem with Holland's product. This retailer was so skeptical of the validity of the Board's testing that it submitted its own samples of Holland products in its custody. This testing also detected the presence of myclobutanil.

¶ 14. As additional test results from Holland's product samples came in, Board compliance agents found that most of the harvest lots that had been sampled were returning myclobutanil detections from at least some samples. Additionally, one strain that tested above the myclobutanil action limit was found not to have been tested with the harvest lot to which it was assigned in inventory tracking. Instead, records showed that it was tested months later for pathogens and potency—but not, as required, for pesticides. At the beginning of May, in light of the expanding breadth of adulteration, the mixed messages sent to retailers, and the absence of any warning to the consumer public who may have already purchased affected product, the Board issued its notice of violation with immediate effect and accompanying stop-sale order—effectively a mandatory recall of Holland's product.

¶ 15. The pattern of myclobutanil detections in Holland's product was not consistent with inadvertent or environmental exposure. Following single-instance or single-source exposure, the presence of pesticides in product samples would be expected to fade linearly over time, as occurred during the remediation period following Holland's 2023 case. In Holland's 2024 case, however, high test results appeared erratically in product samples attributed to harvest lots that previously tested clean. Almost one-quarter of the approximately 130 samples taken of Holland product during the 2024 case contained detectible levels of myclobutanil, including in pre-rolls, flower, and on-site samples.

¶ 16. The Holland employee testified that the Board's sampling procedures left open a possibility of adulteration by an outside actor and suggested that several of the harvest lots could have been inadvertently switched by a laboratory before testing. The Board found these theories speculative. It determined that the agents' sampling technique was careful and consistent with industry standards. It also found that the owner of the laboratory where the alleged switch might have occurred demonstrated a thorough understanding and consistent execution of the methods necessary to deliver reliable, accurate certificates of analysis for cannabis products, and that her laboratory used an inventory-management system to prevent and detect mistakes in sample organization. The Board further observed that Holland's credibility was "badly injured by its conduct after it was notified of [myclobutanil] detections," including its deferral of the compliance agents' sampling visit.

¶ 17. The Board noted that myclobutanil does not spontaneously appear in the environment, and that indoor cultivation sites such as Holland's "are tightly controlled and much less susceptible to environmental drift than their outdoor counterparts, where over-limit adulteration by drift or sabotage nonetheless is unprecedented in the Board's experience." It found that to the extent inadvertent exposure was possible, preponderant evidence tended to rule out its innocent forms. The Board concluded that the evidence "point[ed] overwhelmingly" to Holland's facility as the source of myclobutanil adulteration in this case and found that it was "much more probable that the myclobutanil found in Holland product was introduced through a willful, wrongful act than through simple negligence or bad luck."

¶ 18. Based on these findings, the Board dismissed violation 1, concluding that where pesticide use itself was the heart of the case, invoking Rule 4.5.1(c) tended to punish the same conduct twice. However, it upheld violations 2 and 3, explaining that Holland used myclobutanil in its cultivation operation in violation of the law and its own corrective action plan, thus contravening Board Rules 4.5.1(d) and 4.5.2(m). The Board then weighed several aggravating

7

and mitigating factors and concluded that the appropriate penalty was revocation of Holland's cannabis-establishment license.

¶ 19. Holland appealed to an appellate officer. See 7 V.S.A. § 847(a)(1) ("A party aggrieved by a final decision of the Board may, within 30 days of the decision, appeal that decision by filing a notice of appeal with the Executive Director who shall assign the case to an appellate officer."). After briefing and oral argument, the appellate officer issued a written decision affirming the Board's order. This appeal followed. See id. § 847(c) ("A party aggrieved by a decision of the appellate officer may appeal to the Supreme Court.").

¶ 20. We assess Holland's claims on the record created before the Board and under the same standard of review applied by the appellate officer. 7 V.S.A. § 847(c); Tarrant v. Dep't of Taxes, 169 Vt. 189, 195, 733 A.2d 733, 738 (1999). That standard precludes us from substituting our judgment for that of the Board as to the weight of the evidence on questions of fact. Pomerantz v. Cannabis Control Bd., 2024 VT 57, ¶ 11, __ Vt. __, 327 A.3d 807 (citing 7 V.S.A. § 847(b)-(c)). It also requires that the Board's order be upheld absent a showing that Holland's substantial rights have been prejudiced because the Board's findings, inferences, conclusions, or decisions: violate constitutional or statutory provisions; exceed the Board's statutory authority; or are made upon unlawful procedure, affected by other error of law, clearly erroneous in view of the record evidence, arbitrary or capricious, or characterized by an abuse or clearly unwarranted exercise of discretion.[1] Id.; 7 V.S.A. § 847(b).

---

[1] We note that Holland briefly asserts, in connection with its challenge to the Board's establishment and operation under the separation-of-powers doctrine, that the Board is not entitled to "any deference . . . as an administrative agency." For the reasons discussed below, Holland failed to satisfy the minimum briefing standards of Vermont Rule of Appellate Procedure 28(a)(4) with respect to this argument—including any contention it may have intended to raise regarding the applicable standard of review—and we therefore decline to address it. Infra, ¶ 39.

¶ 21. While Holland briefly assigns error to several of the appellate officer's rulings, we do not address these arguments. Where, as here, an appellate officer "did not take evidence but functioned solely as an appellate body," we review the Board's decision without deference to the appellate officer's conclusions.[2] Pomerantz, 2024 VT 57, ¶ 11 (declining to address applicant's arguments concerning appellate officer); see Devers-Scott v. Off. of Pro. Regul., 2007 VT 4, ¶ 4, 181 Vt. 248, 918 A.2d 230 (explaining that "[w]here there is an intermediate level of appeal from an administrative body," we review the agency's initial decision independently, recognizing that "[t]he statute simply gives parties two appeals" (quotations omitted)). Our review is thus limited to Holland's arguments regarding the Board's actions.

¶ 22. We begin by considering Holland's challenges to the May 2024 order requiring that Vermont retail cannabis establishments immediately stop the sale of "all Holland Cannabis products." Holland argues that: (1) in issuing a stop-sale order applicable to all of its products, the Board exceeded the authority the Legislature granted it under 7 V.S.A. § 904(e)(1); and (2) even if the Board had authority to issue a stop-sale order encompassing all of Holland's product, the order was not supported by a sufficient factual basis under Board Rule 4.6.2.[3] We consider each contention in turn.

---

[2] An appeal to an appellate officer "shall be conducted on the basis of the record created before the Board," except that "[i]n cases of alleged irregularities in procedure before the Board not shown in the record, proof on that issue may be taken by the appellate officer." 7 V.S.A. § 847(a)(2); Board Rule 4.13(f) (providing that such evidence may be taken "[u]pon motion and good cause shown"). Holland did not move for permission to present additional evidence before the appellate officer.

[3] Holland also argues, in passing, that the Board violated its due-process rights by failing to afford appropriate procedural safeguards in connection with the stop-sale order. Although the Board concluded that this argument was beyond the scope of the license-revocation proceeding, Holland fails to assign error to this conclusion. See Agency of Transp. v. Timberlake Assocs., LLC, 2024 VT 14, ¶ 26, 219 Vt. 97, 315 A.3d 967 (explaining that failure to assign error to trial court's conclusion that appellants' constitutional argument was beyond scope of remand resulted in forfeiture of constitutional argument on appeal). Moreover, Holland's due-process challenge is unsupported by meaningful analysis or citation to relevant authority and thus fails to satisfy the minimum briefing standards of Vermont Rule of Appellate Procedure 28. See V.R.A.P.

¶ 23.     Section 904(e)(1) of Title 7 provides that "[o]nly unadulterated cannabis shall be offered for sale."  It mandates that "[i]f, upon inspection, the Board finds any violative pesticide residue or other contaminants of concern," it "shall order the cannabis, either individually or in blocks, to be: (A) put on stop-sale; (B) treated in a particular manner; or (C) destroyed according to the Board's instructions."  Holland contends that the statutory language authorizing the Board to issue stop-sale orders applicable to "blocks" of cannabis did not permit it to issue an order applicable to all Holland products, including product from harvest lots that had been tested and returned clean certificates of analysis.

¶ 24.     Title 7 does not define "in blocks."  "[W]here a statute is silent or ambiguous and an agency charged with enforcing the statute has interpreted it, this Court will defer to the agency interpretation of the statute within its area of expertise."  Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215.  Section 904(e) charges the Board with enforcing the statutory prohibition on offering adulterated cannabis for sale, including through the issuance of stop-sale orders.  As a result, the methods by which those orders are carried out fall within the Board's area of expertise.  See, e.g., Plum Creek Me. Timberlands, LLC v. Vt. Dep't of Forests, Parks & Recreation, 2016 VT 103, ¶¶ 28-29, 203 Vt. 197, 155 A.3d 694 (explaining that where agency has broad statutory authority "both to set standards for acceptable forest management and to enforce compliance with those standards," its choice of methodology for measuring residual basal area of forest to determine compliance with management plan was within its area of expertise and entitled to deference).  Here, the Board effectively concluded that all of Holland's cannabis product constituted a "block[]" within the meaning of § 904(e)(1).  In the absence of compelling indication

28(a)(4)(A) (requiring that argument in appellant's brief contain "appellant's contentions and the reasons for them—with citations to the authorities, statutes, and parts of the record on which the appellant relies").  We therefore decline to address it.  State v. Bergquist, 2019 VT 17, ¶ 64 n.13, 210 Vt. 102, 211 A.3d 946 ("We will not consider issues, even those of a constitutional nature, that are insufficiently raised and inadequately briefed.").

of error, we will sustain this interpretation " 'unless it is unjust or unreasonable.' " Shires Hous., 2017 VT 60, ¶ 9 (quoting Laumann v. Dep't of Pub. Safety, 2004 VT 60, ¶ 7, 177 Vt. 52, 857 A.2d 309)).

¶ 25. Holland fails to engage with the statutory language at issue and thus has not identified any basis on which to conclude that the Board's interpretation of "in blocks" is unjust, unreasonable, or erroneous. The statute provides that "[c]annabis ordered destroyed or placed on stop-sale shall be clearly separable from salable cannabis." 7 V.S.A. § 904(e)(2). The Board's May 2024 notice of violation alleged that myclobutanil adulteration had been found in retail samples of Holland's flower, including samples from harvest lots that displayed no detectable myclobutanil in earlier tests, and that this pattern was "unprecedented in Vermont and would be consistent with adulteration of harvested cannabis flower occurring at the cultivation site after testing." On this factual basis, it was reasonable for the Board to conclude that there was no "salable"—in other words, "unadulterated"—cannabis that was "clearly separable" from that portion of Holland's product found to contain myclobutanil. Id. § 904(e)(2). This interpretation of "in blocks" is also consistent with the Legislature's statement of purpose indicating that Title 7 is, among other things, intended to protect the public welfare, health, and safety, and must be "liberally construed to accomplish its purposes." Id. § 1. We defer to the Board's interpretation of "in blocks" and conclude that issuance of a stop-sale order applicable to all of Holland's cannabis, including cannabis from harvest lots that previously returned clean certificates of analysis, did not exceed the legislative grant of authority at § 904(e)(1).

¶ 26. Holland next argues that Board Rule 4.6.2's requirement that stop-sale orders be issued "only when necessary to mitigate a threat or potential threat to health and safety" was violated because Holland had already participated in a voluntary recall and the parties stipulated,

prior to the Board hearing, that no evidence would be offered into the record "to the effect that any person complained to the Board in 2024 of illness arising from Holland Cannabis products."[4]

¶ 27. This Court typically defers to an agency's interpretation of its own promulgated regulations. In re Conservation L. Found., 2018 VT 42, ¶ 15, 207 Vt. 309, 188 A.3d 667. We will overturn such an interpretation only if it exceeds the authority granted to the agency under its enabling statute, is shown to conflict with past agency interpretations of the same rule absent legitimate justification, results in unjust, unreasonable, or absurd consequences, or otherwise bears compelling indicia of error. Id. ¶ 16; In re McNamer, 2024 VT 50, ¶¶ 20, 22, __ Vt. __, 325 A.3d 15.

¶ 28. Holland has not identified any reason to depart from our deferential standard of review. It does not explain how the fact that no consumer reported illness after using Holland's product could negate the existence of a "threat or potential threat to health and safety." Board Rule 4.6.2. As the Board explained in its stop-sale order, Holland introduced adulterated cannabis to the consumer market, creating a risk of illness. The plain language of Rule 4.6.2 does not require that such risk manifest itself in actual harm to the health and safety of consumers before the Board may act upon it. Moreover, although Holland participated in a voluntary recall, the unprecedented and widespread detection pattern described by the Board in the notice of violation could reasonably undermine any conclusion that these efforts were sufficient to address the threat or potential threat. The Board thus set forth a factual basis sufficient to support the existence of a "threat or potential

---

[4] Holland also asserts that, in assessing the risk of harm, the Board "disregarded or ignored the regulations of numerous other states" that allegedly have higher action limits for myclobutanil in cannabis products. Holland raised this argument prior to the Board hearing, but, in its procedural order, the Board explained that whether myclobutanil is unsafe for use in cannabis was beyond the scope of the license-revocation proceeding. Holland fails to assign error to the Board's conclusion in this regard or to adequately brief its argument on the merits. See Timberlake Assocs., 2024 VT 14, ¶ 26; Bergquist, 2019 VT 17, ¶ 64 n.13. We therefore decline to address this contention.

12

threat to health and safety" as necessary to issue a health-and-safety order under Rule 4.6.2. Holland has not demonstrated that the Board erred in issuing the May 2024 order.

¶ 29. Next, we consider Holland's argument that it was deprived of its due-process right to an impartial decisionmaker. Holland argues that the Board chair made public remarks demonstrating that he prejudged the issues before the Board at the hearing and was incapable of judging the controversy fairly on the basis of its own circumstances, and that he therefore erred in declining to recuse himself on Holland's motion.[5]

¶ 30. Due process requires a fair hearing before an impartial decisionmaker, both in the courts and in administrative agencies performing adjudicative functions. In re Grismore, 2024 VT 70, ¶ 17, __ Vt. __, 329 A.3d 199; see Withrow v. Larkin, 421 U.S. 35, 46-47 (1975). "The presence of bias—or prejudgment, a form of bias—may preclude a fair and impartial hearing." Burch-Clay v. Taylor, 2015 VT 110, ¶ 23, 200 Vt. 166, 130 A.3d 180. However, "[t]here is a presumption of honesty and integrity in those serving as administrative adjudicators." Sec'y, Agency of Nat. Res. v. Upper Valley Reg'l Landfill Corp., 167 Vt. 228, 235, 705 A.2d 1001, 1005 (1997) (citing Withrow, 421 U.S. at 47). As in judicial disqualification proceedings, the moving party bears the burden of overcoming that presumption by establishing grounds for recusal. Id.; McIsaac v. Univ. of Vt., 2004 VT 50, ¶ 22, 177 Vt. 16, 853 A.2d 77 (citing State v. Putnam, 164

---

[5] Holland also briefly contends that the chair violated the Vermont Code of Ethics, 3 V.S.A. §§ 1201-1205, in failing to issue a public written statement explaining why he had no disqualifying conflict of interest. Holland did not raise this argument before the Board but contends that it preserved the issue by presenting it to the appellate officer. See Pratt v. Pallito, 2017 VT 22, ¶ 16, 204 Vt. 313, 167 A.3d 320 ("[W]e have consistently held that we will not address issues that were not properly preserved before the relevant administrative agency."). "The very purpose of the preservation rule," however, "is to ensure that the original forum is given an opportunity to rule on an issue prior to our review." In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270-71 (2001) (emphasis added). Because Holland's argument is that the chair was required to issue a statement under the Code, it could preserve the issue only by first presenting it to the chair "with specificity and clarity in a manner which gives the agency a fair opportunity to rule on it." Pratt, 2017 VT 22, ¶ 16 (quotation and brackets omitted). Because Holland did not do so, we decline to address this argument as unpreserved.

Vt. 558, 563, 675 A.2d 422, 425 (1996)). Because "[a]bsent a legal disqualification, the existence of disqualifying prejudice becomes a question of fact," In re Davenport, 129 Vt. 546, 556, 283 A.2d 452, 456 (1971), the movant's burden includes the obligation "to make a record on which a decision could be reached." Putnam, 164 Vt. at 563, 675 A.2d at 425. In sum, "[w]e must start . . . from the presumption" that the chair is unbiased, recognizing that "the burden of establishing a disqualifying interest rests on" Holland. Schweiker v. McClure, 456 U.S. 188, 195-96 (1982). Holland's argument fails because it did not make any evidentiary record and, as a result, necessarily did not establish grounds for disqualification.

¶ 31. In its prehearing filings, Holland briefly quoted several statements it alleged the chair—or in one case, "persons from the Board"—made to media outlets about the 2024 case. It did not identify the majority of the media outlets at issue or recite the questions that allegedly elicited these statements. Although Holland attached several exhibits to its second prehearing filing, it did not include copies of the referenced media reports or any affidavit relevant to these allegations in either filing.[6] The filings also did not request the chair's recusal or seek an evidentiary hearing on the issue. Instead, Holland moved for the chair to recuse himself for the first time in an oral motion at the beginning of the hearing. In connection with this request, counsel for Holland asked that the chair admit to making the public remarks attributed to him in Holland's prehearing filings. The chair responded that he was unsure what statements Holland was referring to, Holland's counsel indicated that he would read from the filing, and the chair responded that the filing was part of the record. At this point, Holland's counsel abandoned his effort to obtain the

---

[6] In making this observation, we do not suggest that there was any requirement that Holland file an affidavit in support of its motion. While Vermont Rule of Civil Procedure 40(e)(2) requires that a motion seeking disqualification of a trial judge "be accompanied by an affidavit, or a certificate of a party's attorney subject to the obligations of Rule 11, stating the reason therefor," neither party has identified any similar procedure applicable to motions seeking recusal of a Board member. We note, however, that the Board is free to adopt such a procedure should it choose to do so.

chair's admission to the statements in question and simply moved for the chair to recuse himself. The chair denied the motion, and there was no further discussion of the issue during the hearing.

¶ 32.    Holland's argument is that its prehearing filings satisfied its burden to prove the existence of disqualifying prejudice.  The fact that these unsworn filings are part of the record, however, does not mean that the allegations therein are evidence that could serve as the basis for a recusal decision.  Under Vermont's Administrative Procedure Act, an agency's factual findings in a contested case "shall be based exclusively on the evidence and on matters officially noticed." 3 V.S.A. § 809(g); see id. § 801(b)(2) (" 'Contested case' means a proceeding, including by not restricted to . . . licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing.").  As the Board correctly recognized in its decision, Holland's "written response . . . stands as a pleading that is not itself evidence."  Holland simply did not introduce any evidence in support of its recusal motion.

¶ 33.    As a result, Holland did not meet its threshold burden to "to make a record on which a decision could be reached."  Putnam, 164 Vt. at 563, 675 A.2d at 425; see, e.g., In re Odessa Corp., 2006 VT 35, ¶ 10, 179 Vt. 640, 898 A.2d 1256 (mem.) (affirming denial of motion for recusal of Liquor Control Board members in liquor-license suspension proceeding where licensee "failed to substantiate" allegation that members "had improperly prejudged the case and were biased against it"); Ainsworth v. Chandler, 2014 VT 107, ¶ 16, 197 Vt. 541, 107 A.3d 905 (concluding there was no basis to disturb denial of defendant's motions to recuse trial judge where he "offered no evidence to lend factual support to any of his allegations of prejudice").  "Without a showing to the contrary, state administrators 'are assumed to be [persons] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' "  Withrow, 421 U.S. at 55 (quoting United States v. Morgan, 313 U.S. 409, 421

15

(1941)). Because Holland failed to create an evidentiary record on this issue, it necessarily failed to show that it was denied its due-process right to an impartial decisionmaker.[7]

¶ 34. Holland also argues that the Board violated Vermont Rule of Evidence 612. See Board Rule 4.10(e) ("Evidence may be introduced at the hearing in accordance with 3 V.S.A. § 810."); 3 V.S.A. § 810 ("The Rules of Evidence as applied in civil cases in the Superior Courts of this State shall be followed."). It contends that the Board failed to take appropriate action after Holland objected that the witness was "repeatedly consulting a document" outside the record because Rule 612(a) entitled Holland to production of the document at the hearing. Holland asserts that the document was not shared with it until five days after the hearing, leaving open the possibility of alteration, and argues that the Board's written decision mischaracterized the contents of the document and the extent of the witness's reliance on it.

¶ 35. Review of the hearing transcript demonstrates that none of these issues are properly preserved for our review. Pratt, 2017 VT 22, ¶ 16. Following Holland's objection, the compliance agent explained that she was referring to a timeline she prepared to help her recall the relevant dates. The Board's attorney then asked whether Holland sought "a further ruling" from the chair, or whether the witness's explanation was "satisfactory." In reply, Holland's counsel asked whether there was a "commitment to share it at some point?" Counsel for the Board indicated that the document would be shared absent any contrary ruling from the chair. No such ruling was

---

[7] As a result, we do not reach the Board's alternative argument: that even if the chair made the statements Holland sought to attribute to him, they would not require his recusal. We note, however, that the Board appears to misconstrue Holland's contention on this point insofar as it suggests that such statements are appropriate because they were "not ad hominem attacks" but instead "clearly involved the merits of the issue." It appears that this was the precise point Holland was attempting to make—that the chair's statements required his disqualification because they suggested that he had already reached a conclusion on the critical factual issue to be determined at the hearing, which was whether Holland had used myclobutanil. See, e.g., In re Illuzzi, 164 Vt. 623, 623, 670 A.2d 1264, 1264 (1995) (mem.) (explaining that for purposes of recusal motion, distinction between written statements that merely describe attorney-discipline charges and those that reflect decisionmaker prejudged case is "significant").

forthcoming, and counsel for the Board resumed examining the agent without further objection from Holland.

¶ 36. Rule 612(a) provides that, "[i]f, while testifying, a writing or object is used to refresh the witness's memory, an adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition in which the witness is testifying." A party entitled to production of a writing or object under Rule 612(a) has the right "to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." V.R.E. 612(c). Holland did not seek production of the document during the hearing. As a result, it forfeited the opportunity, secured by Rule 612(a), to cross-examine the witness regarding the contents of the document and introduce into evidence any portions relating to her testimony. This argument and Holland's related claims are therefore not preserved for our review.

¶ 37. Holland also contends that the Board failed to prove, under the applicable preponderance-of-the-evidence standard, that Holland intentionally introduced myclobutanil into its product as necessary to sustain its conclusion that Holland violated Board Rules 4.5.1(d) and 4.5.2(m). Holland's primary challenge to the Board's findings arises from the Board's acknowledgment, in its written decision, that it was "troubled that the means of myclobutanil introduction into [Holland's] products remains unclear." Holland does not, however, explain why it was necessary for the Board to determine the means by which myclobutanil was introduced into Holland's product in order to sustain its findings that Holland: "[f]ail[ed] to abide by a corrective action plan," a violation of Board Rule 4.5.1(d); and "us[ed] unauthorized pesticides, soil amendments, fertilizers or other crop production aids," a violation of Rule 4.5.2(m). The Board found it more likely than not that Holland "employed myclobutanil in its cultivation operation" and did so "in contravention of the ongoing corrective action plan established in 2023 to prevent just that from reoccurring." See In re M.L., 2010 VT 5, ¶ 25, 187 Vt. 291, 993 A.2d 400 (providing that preponderance standard satisfied "[w]hen the equilibrium of proof is destroyed, and the beam

17

inclines toward [the party] who has the burden, however slightly . . . . A bare preponderance is sufficient, though the scales drop but a feather's weight" (quotation omitted)). That the Board was unable to determine the means through which myclobutanil was employed in Holland's cultivation operation does not render this finding clearly erroneous.

¶ 38. Holland also argues that the Board gave insufficient consideration to its alternative theories regarding how myclobutanil could have been introduced into its product. This is, in effect, an invitation for this Court to substitute its judgment for that of the Board as to the weight of the evidence on a question of fact—something we are expressly precluded from doing under the applicable standard of review. Pomerantz, 2024 VT 57, ¶ 11; 7 V.S.A. § 847(b). Holland has not demonstrated that the Board's findings are "clearly erroneous in view of the evidence on the record as a whole." 7 V.S.A. § 847(b)(5). Therefore, we will not disturb them on appeal.

¶ 39. Finally, Holland contends that the Board's decision should be vacated and its license reinstated because the Board's establishment and operation violates the separation-of-powers doctrine set forth in the Vermont Constitution. See Vt. Const. ch. II, § 5 ("The Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others."). For several reasons, this argument is inadequately briefed. First, while Holland asserts that the Board erred in concluding that its constitutional challenge to the Board's enabling legislation was not cognizable in the license-revocation proceeding, Holland neglects to offer any supporting analysis or cite to any relevant authority. See Timberlake Assocs., 2024 VT 14, ¶ 26. Second, although Holland frames its argument as a facial challenge to the statute, it goes on to contend not that the statutory delegation of authority is unconstitutional, but instead that the Board exceeded its statutory authority in issuing the stop-sale order—an entirely different argument, and one we considered and rejected above. Supra, ¶¶ 22-25. Lastly, the only authority Holland identifies in support of its facial challenge is a June 2023 letter from Vermont Governor Philip B. Scott to the Clerk of the Vermont House of

18

Representatives explaining the constitutional concerns animating his decision to allow H.270, a bill that repealed the sunset of the Board, to become law without his signature. Merely drawing our attention to this letter without any supporting analysis or further citation does not satisfy Holland's "duty to diligently develop and plausibly maintain the state constitutional issues it raises on appeal." State v. Gleason, 154 Vt. 205, 212, 576 A.2d 1246, 1250 (1990); see, e.g., Pease v. Windsor Dev. Rev. Bd., 2011 VT 103, ¶ 29 n.4, 190 Vt. 639, 35 A.3d 1019 (mem.) (declining to address constitutional argument as inadequately briefed where appellant "provide[d] no substantive analysis" on issue). We therefore decline to address this argument, too, as inadequately briefed.

Affirmed.

FOR THE COURT:

_____

Associate Justice

19